**SWIFT & CO. v. WALLACE, Secretary of Agriculture.**

No. 6709.

Circuit Court of Appeals, Seventh Circuit.

July 15, 1939.

---

\* Bryant v. Lindsay, 94 N.J.L. 357, 110 A. 823; Yosemite Lumber Co. v. Industrial Acc. Comm., 187 Cal. 774, 204 P. 226, 20 A.L.R. 994.

John Lord O'Brian, of Buffalo, N. Y., and C. B. Shaw, of Chicago, Ill. (Albert H. & Henry Veeder and E. B. Kixmiller, all of Chicago, Ill., John F. Rich, of Boston, Mass., and William I. Morey, of Buffalo, N. Y., of counsel), for petitioner.

Thurman Arnold, Asst. Atty. Gen., Mastin G. White, C. E. Miles, Wendell Berge, Sp. Asst. to Atty. Gen., and Edward J. Hickey, Jr., all of Washington, D. C., for respondent.

Paul M. Godehn and Dean Lake Traxler, both of Chicago, Ill., amicus curiæ.

Before MAJOR, TREANOR, and KERNER, Circuit Judges.

TREANOR, Circuit Judge.

This cause comes before this court on a petition to set aside an order of the respondent, Secretary of Agriculture. Respondent found that petitioner was violating Section 202 of the Packers and Stockyards Act of 1921,[1] and on the basis of such finding entered a cease and desist order authorized by Section 203(b) of the Act.[2] Petitioner seeks a review of such order under authority of Section 204(a).[3]

Petitioner [3a] is a packer within the definition of the act. Respondent instituted proceedings against petitioner by the issuance of a complaint, which as amended, alleged among other things that petitioner was engaged in the following practices: (a) Price discrimination, (b) credit discrimination, (c) monopolizing and restraining commerce by the aforesaid price and credit discriminations, (d) giving unreasonable preferences in the form of price discounts, (e) making unfair and unjust discrimination in weight basis.

Respondent's report and findings of fact state that charges (a) and (c) were not supported by the evidence. The other charges, (b), (d) and (e) were found to be supported by the evidence and the order was based thereon. The findings may be summarized as follows: (1) Petitioner had given unreasonable preferences and effected unreasonable prejudice in commerce by granting longer terms of credit to certain customers than to others; and by granting discounts to certain customers and not to others. (2) Petitioner had engaged in the unfair and unjustly discriminatory practice of requiring certain customers to buy according to weight of meat at the time of packing, paper wrappings being included in such weight, and permitting other customers to buy according to actual weight at time of delivery. It was also found that the purchasers who bought according to actual weight at the time of delivery, which was known as the "stripped weight" basis, paid the same per pound prices as those who did not receive the benefit of "stripped weight" basis.

The persons who claim to have been prejudiced by the practices of petitioner are known as "purveyors," the term "purveyor" being defined as one catering to or engaged in supplying meat to hotels, restaurants, clubs, steamship lines, and institutions, both public and private. The purveyors buy their meat products from petitioner and all other packers who are engaged in business in what is described as the "New York Area." By shopping among all packers a purveyor is able to furnish special quality and cuts of meat to customers. The packers, including petitioner, solicit and sell directly to the hotels, restaurants, clubs, steamship lines and public institutions, whose trade is the chief market sought by purveyors and is known to the packers and purveyors as institutional trade. Some purveyors act as retail butchers. Also, petitioner and other packers own subsidiary corporations which furnish the services which are supplied by purveyors.

Petitioner customarily sells to its customers on credit terms of approximately one week, which is the credit term allowed to 95% of its trade; and respondent found "that weekly terms of credit have been the usual and accepted practice for a number of years; that the only exceptions relate to sales made to state, county, and municipal governments, and in a much lesser degree to restaurants and hotels." The custom of packers generally is to confine the trade to the weekly term, with the exceptions noted in the case of the institutional trade. The purveyors extend the same credit terms to the institutional trade as do the packers. As between purveyors the petitioner makes no distinctions as to terms of credit, all receiving the usual weekly term. Petitioner pays for livestock on a "spot cash" basis and pays its labor on

[1] 7 U.S.C.A. § 192.

[2] 7 U.S.C.A. § 193(b).

[3] 7 U.S.C.A. § 194(a).

[3a] Swift & Co., petitioner before this

Court was respondent in the proceedings before the Secretary of Agriculture and is so designated in the report and findings of the Secretary, who is respondent here.

a weekly basis. Petitioner points out that the purveyors receive better terms of credit from it than it receives from its vendors.

The provisions of the act which are pertinent to the present proceeding are as follows:

"It shall be unlawful for any packer * * * to:

"(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or

"(b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *". 7 U.S.C.A. § 192.

 The foregoing language does not purport to confer upon the Secretary of Agriculture any authority directly to regulate prices, or discounts, or sales methods; and clearly does not contemplate the exercise of any authority to establish uniformity of practice in respect thereto. Differences or variations in prices, or in the terms of credit, or amounts of discount, or in practices do not come within the ban of the act unless they in fact constitute engaging in or using an unfair or unjustly discriminatory or deceptive practice or device in commerce or unless they constitute a making or giving, in commerce, of an undue or unreasonable preference or advantage, or result in undue or unreasonable prejudice or disadvantage as between persons or localities.

Respondent contends that the distinction in credit treatment between purveyors and institutional trade by petitioner was an unreasonable preference and a violation of Section 202 (b) of the act. The report of the Secretary of Agriculture reveals that the Secretary was of the opinion that the fact of competition was not material to the question of unreasonableness of preference. The report states that "it can hardly be said that an extension of credit by respondent to hotels and restaurants can lawfully be withheld from a purveyor merely because the extension of such terms of credit to hotels and restaurants was for the purpose of meeting competition." The report further states that "it is probable that credit may be granted or withheld, depending upon the financial responsibility of the purchaser, but it is believed that respondent cannot discriminate against customers and escape the operation of the statute merely by asserting that such discrimination was for the purpose of meeting competition." The report does not make any finding as to the nature of the competition that existed, whether fair or unfair, nor who initiated such competition. It is clear that the respondent considered competition of any kind as wholly without significance, and that the only justification for differences of credit terms was difference in credit rating.

Respondent contends that a review of the findings of unreasonable preference and unjust discount is limited to a review of a finding of fact; and states that "since Congress in the Packers and Stockyards Act adopted language practically identical to (the) provision in the Interstate Commerce Act (49 U.S.C.A. § 3 (1) it is only reasonable to presume a similar construction"; and in support of the foregoing respondent calls attention to cases involving the Interstate Commerce Act in which are found statements generally in accordance with respondent's contention. But the statements of the Supreme Court on the point have not been without qualification; and in Central R. Co. v. United States,[4] cited by respondent, the pertinent statement is as follows: "As to administrative orders operating *in futuro,* the Commission's findings of fact are conclusive, subject to qualifications here not pertinent; and a finding that the discrimination is unjust is *ordinarily* a finding of fact." *(our italics.)* On the other hand, petitioner cites cases arising under the Federal Trade Commission Act which hold that an "unfair method of competition" is a question of law.[5] But apart from the question whether a review of a finding of "any undue or unreasonable preference or advantage" presents a question of fact or law, it is clear that the Supreme Court frequently has recognized certain criteria for the determination of what is undue discrimination under the Interstate Commerce Act, and has at times ordered the setting aside of the Commission's finding or order for failure to apply such criteria. In Interstate Commerce Commission v. Alabama Midland Railway Co.[6] the

---

[4] 257 U.S. 247, 256, 42 S.Ct. 80, 82, 66 L.Ed. 217.

[5] Federal Trade Comm. v. Gratz, 253 U.S. 421, 40 S.Ct. 572, 575, 64 L.Ed. 993.

[6] 168 U.S. 144, 18 S.Ct. 45, 49, 42 L.Ed. 414.

Supreme Court recognized the duty of the Interstate Commerce Commission to consider the fact of competition in making a finding of undue or unreasonable preference or advantage. The court pointed out that it was not holding "that the mere fact of competition, no matter what its character and extent, necessarily relieves the carrier from the restraints of the third and fourth sections, but only that these sections are not so stringent and imperative as to exclude in all cases the matter of competition from consideration, in determining the questions of 'undue or unreasonable preference or advantage,' or what are 'substantially similar circumstances and conditions.'"

The evidence establishes beyond any question that competition was a substantial factor in creating the practice of extending credit to institutional trade beyond the normal term of a week; that all vendors in the New York Area grant longer than weekly terms to the institutional trade, and that this is an exception to the general practice. A purveyor-witness testified that "weekly terms of credit are not peculiar just to Swift & Co.," and he further testified that the granting of weekly terms was a rule of all the packers and "goes back to 35 years." The evidence also establishes that vendors cannot sell to institutional trade, including hotels, restaurants, steamship lines, etc. unless they are willing to extend terms of credit for longer periods than a week. A purveyor-witness called by respondent testified that "everybody who sells to (public institutions) has difficulty in collecting their money on weekly terms of credit"; and that "some of the packers don't carry them."

It is clear from what has been said that in selling to the institutional trade petitioner must compete with all other packers and also with the purveyors. That portion of the Secretary's report which covers price discrimination contains the conclusion that the petitioner "did not charge any of its customers prices different than charged other customers for the purpose of injuring or discriminating against any particular customer;" and the report further states that "the price differences shown appear to have resulted from the competitive nature of the business." The gist of the foregoing is that although petitioner did charge different prices, such differences did not constitute unlawful discrimination since it appeared "to have resulted from the competitive nature of the business." As respects credit terms, it is clear that petitioner was faced with the alternative of either extending at least thirty days credit to the institutional trade or of losing such trade. The evidence discloses that pressure for longer than weekly credit in favor of institutional trade comes from such trade. There is nothing in the findings to indicate that the methods of competition which were used by the packers and purveyors in seeking the institutional trade were initiated in bad faith, or continued in bad faith, or were the result of concert of action, or constituted in any respect other than fair and open competition to meet the demands of the market. The purveyors extend longer credit terms to the institutional trade, and as stated above, there is no discrimination by the petitioner as between purveyors. The unlawful discrimination, if any, is between the institutional trade as consumer customers and the purveyors as jobber customers of petitioner. But the institutional vendees of petitioner do not compete with the purveyors. The respondent, Secretary of Agriculture, considered that the lack of a competitive relation between two classes of vendees of petitioner, the members of one of which were alleged to have been preferred over the members of another, was without significance for the determination of the existence of undue preference. It is true, as urged by respondent, that the purveyors are customers of petitioner, but it is also a material fact that the purveyors are competitors of petitioner; and it is only in the competitive relationship existing among the packers and the purveyors that the alleged undue preference and advantage has any significance.

■ In our opinion the Secretary excluded from consideration three factors, or elements, the consideration of which is essential to the making of a valid finding of undue and unreasonable preference and advantage when, as in the instant proceedings, the evidence shows the existence of these factors. These factors may be stated as follows: (a) Competition between petitioner and other packers, (b) competition between petitioner and the purveyors, and (c) the lack of competition between the party to whom the alleged undue preference and advantage was given and the party discriminated against.

■ "Unreasonable" is not a word of fixed content and whether preferences or advantages are unreasonable must be deter-

mined by an evaluation of all cognizable factors which determine the scope and nature of the preference or advantage. In our opinion the existence of certain factors, which petitioner sought to establish, would negative the existence of unreasonableness in any preference or advantage resulting from the petitioner's terms of credit. These factors are (1) a good faith competition between petitioner and other packers characterized by normally fair methods; (2) a like competition between petitioners and purveyors; and (3) the lack of competition between the party preferred and the party claiming to be discriminated against. The Supreme Court has declared that under the Interstate Commerce Act circumstances substantially affecting competitive conditions may justify discrimination and preference in rates.[7]

The facts in Interstate Commerce Commission v. Chicago Great Western Ry. Co.[8] disclose that certain railroads were charging higher rates upon livestock than upon dressed meats shipped between the same points, and it was contended that this gave to shippers of the prepared product an unreasonable preference and subjected the owners, shippers and sellers of livestock to an unreasonable prejudice. Several railroads were competing for business between the points and one of the railroads, in order to increase its portion of the prepared products business, had cut the rate thereon. The other railroads thereupon established the same rate in order to meet competition. Thereupon the Interstate Commerce Commission entered a cease and desist order. In its opinion affirming a reversal of the Commission's order the Supreme Court stated that "in fixing their own rates they [railroads] may take into account competition with other carriers, provided only that the competition is genuine, and not a pretense." In speaking of the action of the railroad which initiated the lower rates the court stated that such railroad reduced the rate in order to secure more of the traffic in the products of livestock than it had been able to obtain previously; and the court added "that is one of the facts induc-

ing competition, and one of the results expected to flow from a reduction of rates. It certainly of itself deserves no condemnation." The court further stated that it might be "true, as contended by counsel for the appellant, that even a genuine competition which results in a change of rates does not necessarily determine the question whether the rates as fixed work an undue preference or create an unlawful discrimination." The court added that "those rates fixed may make a preference or discrimination irrespective of the motives which caused the railway companies to adopt them. * * *"

In United States v. Illinois Central R. Co.[9] a carrier established a rate for lumber products which created a preference in favor of some points of production over others, the different localities being in competition with each other. The carrier contended that it granted the rates complained of only when forced to do so by competition. The Supreme Court sustained the cease and desist order made by the Interstate Commerce Commission. In the course of its opinion the Supreme Court stated that the carrier's purpose of developing traffic on its own lines, or of securing competitive traffic were factors to be considered by the Commission, but that such factors did not preclude a finding that the discrimination practiced was unjust. The court further stated that in view of the policy of the transportation act the Commission properly might have concluded that "* * * the carrier's desire to originate traffic on its own lines, or to take traffic from a competitor, should not be given as much weight in determining the justness of a discrimination against a locality as theretofore." The foregoing contains the important implication that a desire to maintain or to enhance competitive status may not be given as much weight when the conduct complained of creates a preference for one locality as against another, the localities being competitors, as should be given to such competitive purpose when the conduct complained of creates a competitive disadvantage among competitors of the one charged with unlawful practice.

---

[7] East Tennessee, etc., Railway Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 S.Ct. 516, 45 L.Ed. 719; Texas & Pacific R. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940; Interstate Commerce Com-

mission v. Alabama Midland Ry. Co., 168 U.S. 144, 18 S.Ct. 45, 42 L.Ed. 414.

[8] 209 U.S. 108, 28 S.Ct. 493, 496, 52 L.Ed. 705.

[9] 263 U.S. 515, 44 S.Ct. 189, 193, 68 L. Ed. 417.

856

In Texas & Pacific R. Co. v. United States [10] the Supreme Court again declared that the theory of the Interstate Commerce Act was that carriers in initiating rates might adjust them "to competitive conditions, and that such action does not amount to undue discrimination."

We believe that it is well within the discussion and reason found in the opinions in the foregoing cases to say that actual competition carried on in good faith by normally fair methods not "heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression * * *"[11] is a fact which must be given substantial weight in determining whether preferences or discriminations are unreasonable within the meaning both of the Interstate Commerce Commission Act and the Packers and Stockyards Act. As necessarily implied in United States v. Illinois Central Railroad Co., supra, the administrative agency properly may give less weight to competitive values in determining the justness, or reasonableness, of a discrimination against a person, or class of persons in competition with those preferred but not in competition with the one causing the discrimination. But if competition is to have any reality in our economic life, an honest purpose to secure competitive advantage by normally fair methods not "heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression * * *" must be considered inconsistent with the existence of an unreasonable preference or discrimination as against those whose competitive interests and objectives are the same as the one who is charged with giving unreasonable preferences.

In the instant case there is no finding as to who initiated the competitive device of giving longer terms to the institutional trade; and we find no evidence which tends to show that the petitioner initiated the practice. The evidence does establish that contract specifications on the basis of which bids are submitted for the trade of public institutions frequently specify a thirty day credit period. By the terms of the order of the Secretary the petitioner must offer sixty days credit to the purveyors, and apparently to all other competitors "of substantially the same credit rating," if in order to successfully compete for the business of an institution which demands sixty days credit, it has submitted a bid subject to the contract specifications. Or if the petitioner, in order to meet competition of another packer, offers thirty days credit terms to a prospective customer the petitioner must grant such credit terms to all who meet the somewhat indefinite credit standard fixed by the order. There is no evidence, and no finding, that the credit terms heretofore given by petitioner are in themselves objectionable according to the standards of the trade. Indeed all the evidence on the subject indicates that they are completely in accord with the business practices of the trade. There is no contention in the instant case that petitioner is restricted by any rule of law, or by any standards of business conduct, in its right to compete with the purveyors. It is true that the purveyors claim the right to the credit advantages as customers; but granting, as an abstract proposition, that as customers of the petitioner the purveyors are entitled to the same terms as other customers similarly situated, it does not follow that they can claim, in the guise of customers, a competitive advantage from the petitioner to enable them to compete on equal terms with the petitioner for the trade of consuming customers.

The statutory provisions relied upon by respondent do not purport to authorize the Secretary of Agriculture to put an end to fair and honest competition between those who are under no legal disability to compete and who by the very nature of the business in which they are engaged must rely upon normally fair methods of competition for business success.

The third factor to which we have referred as having significance is the fact that the purveyors and the institutional trade are not in competition with each other. The resulting reality is that when the petitioner prefers the institutional trade by favorable terms of credit, petitioner is not giving a competitive advantage to the institutional trade as against the purveyors. In Interstate Commerce Commission v. Baltimore & O. R. Co.,[12] a much cited case, the court in the course of its discussion of the words "unreasonable preference and unreasonable prejudice" made the following statement: "These words necessarily involve the idea or element of comparison

---

[10] 289 U.S. 627, 53 S.Ct. 768, 771, 77 L.Ed. 1410.

[11] Federal Trade Comm. v. Gratz, supra.

[12] C.C., 43 F. 37, 47.

of one service or traffic with another similarly situated and circumstanced, and require that, to be undue and unreasonable, the preference or prejudice must relate and have reference to competing parties, producing between them unfairness and an unjust inequality * * *." Normally the lack of competition between the parties preferred and the parties claiming to be subjected to discrimination would be a fact of substantial significance for the determination of the existence of "any undue or unreasonable preference or advantage."

From our examination of the evidence and the report and findings of the respondent we conclude that in making the finding respecting petitioner's giving of unreasonable preferences in credit terms the respondent excluded from consideration the relevant factor of competition, and the order based thereon must be set aside.

In respect to discounts the respondent found that a subsidiary corporation of petitioner was engaged in the business of purveying, that it was the agent of petitioner, and that it gave discounts to some of its customers. This was held to be an unreasonable preference by petitioner. We agree with the finding that the subsidiary is an agent of petitioner for purposes of the proceeding, but do not agree that the discount practice constituted an unreasonable preference. The evidence discloses that the giving of discounts was not confined to petitioner and that the purveyors engaged in the practice. A purveyor-witness testified as follows: "We give discounts to certain of our customers. * * * We do not give discounts to everybody that we sell. * * * My competitors, the New York purveyors, follow the same policy as to discounts. Some give discounts to some customers and not to others * * *. These practices that I speak of as to * * * discounts are common to the purveyor trade in New York." There is no claim that petitioner discriminated among the purveyors. As already noted, the respondent found that the petitioner had not made unreasonable price discrimination. This finding, in substance, seems to be in conflict with a finding that petitioner gave unreasonable preference and advantage to certain of its customers in respect to discounts,—"that it gave discounts to some, and, at the same time, declined and refused to extend discounts to other purchasers of meats and meat food products, under substantially similar circumstances and conditions." The substance of an unreasonable preference granted in the form of a discount is a decrease in actual price. Impelling as the feeling may be to say that respondent intended to find that there was no discrimination in the prices quoted, but that there were unreasonable discounts in the actual prices charged, yet the respondent's finding is silent on the point and the contention here negatives any such reconciliation. Respondent states here that "whether customers to whom a discount was granted and those to whom no discounts were extended actually paid different prices is not the question." But it would seem that whether the customers "actually paid different prices" is a material question because a discount not producing such result would not create any practical difference. The granting of a discount which does not have the effect of lowering the purchase price of one customer over that of another who receives no discount cannot result in an unreasonable preference and advantage to the one receiving the discount, and cannot constitute an undue or unreasonable prejudice or disadvantage of any other person.

But granting that there was an actual price difference created by the discounts the problem presented is precisely the same as the one presented by the credit preference. The petitioner is competing with other packers, including the purveyors, and there is no competition between the recipients of the discounts, who are consuming customers, and the purveyors who claim to be suffering prejudice or disadvantage. The purveyors grant discounts to their customers. It is evident that respondent did not consider that either the amounts of discount or the competitive situation entered into the question of whether the discounts amounted to giving "unreasonable preferences and advantages." In contrast to the foregoing the respondent found that competition negatived the price discrimination charge and accordingly held that there was no unreasonable price discrimination. In respect to price differences respondent considered that it was material that the petitioner did not discriminate among its customers in respect to prices "for the purpose of injuring or discriminating against any particular customer." There is no evidence to support an inference and no finding that discounts were given "for the purpose of injuring or discriminating against any particular customer" and there is no evidence from which it

reasonably can be inferred that the discounts did not result "from the competitive nature of the business." If the discounts were given to meet the needs of bona fide competition and if competition is a justification, as held by respondent in the case of price differences, it would be inconsistent with the intent of the act to disregard the element of competition in determining whether the discounts constituted an undue or unreasonable preference or advantage. In view of the evidence relating to discounts and the portion of respondent's report relating thereto, we must conclude that respondent disregarded the element of competition. The order as to discounts must be set aside because of respondent's failure to consider the fact of competition between petitioner and its competitors, including the purveyors, and the lack of any adversity of interest between the parties alleged to be unduly preferred and the parties alleged to be unduly prejudiced.

It remains to consider that portion of the order of respondent relating to weight basis. The evidence discloses that petitioner sold certain meats, chiefly pork loins, either on the "boxed weight" or on a "stripped weight" basis. Petitioner ships its meat from its plant to a locality of sale, and each pork loin is wrapped separately for the purpose of protecting the meat and reducing shrinkage in weight. The meat is packed in boxes and on each box three weights are noted, the weight of the empty box, the gross weight of the box as packed, and the difference, which represents the net weight of the meat and wrappings. During transit the meat shrinks in weight, and the amount of shrinkage varies. One who purchases by the box is said to purchase on the "boxed weight" basis. Such purchasers are informed by a statement on the invoice that no allowance is made for shrinkage and that the meat is being sold on the basis of the weight of the wrapped meat at the time that it was packed. If a customer so desires petitioner will sell according to the net weight of the meat unboxed and unwrapped at the time of sale. This is known as the "stripped weight" method. The complaint alleges, and respondent found, that petitioner sold to purchasers, who bought on the basis of "stripped weight" at the same per pound prices "based upon the actual net weight at the time of delivery to the purchaser of the meats and meat food products, which actual net weights ranged from one to three pounds less than the stamped net weights for sales in 50

pound and 100 pound boxes." The result is that the purchaser of 100 pound boxes at 20¢ per pound on the "boxed weight" basis pays $20.00 for 97 pounds of meat while the purchaser on the "stripped weight" basis buying at the same price per pound would get 100 pounds for $20.00. The actual result is that the "boxed weight" purchaser is charged more per pound than the "stripped weight" purchaser.

Petitioner contends that its practice is to charge a higher price per pound for the meat sold on the "stripped weight" basis, and further contends that there is no substantial evidence to support respondent's finding that the same price per pound is charged to purchasers on the "boxed weight" basis and those on the "stripped weight" basis.

The customary and usual practice of the packing industry is to sell the type of meat in question by the "boxed weight" method and the petitioner follows this practice in all instances except where a customer demands the privilege of purchasing on the "stripped weight" basis. The evidence is uncontradicted that petitioner was willing to sell on a "stripped weight" basis to all who so requested; and petitioner insists, contrary to the contention and finding of respondent, that in all cases of such sales the price per pound was higher than when sold on the "boxed weight" basis. Petitioner points out that in effecting sales in large quantities it would be impracticable to remove the pork from the boxes, strip the wrappings and weigh the meat. The time consumed in this handling and weighing and the resulting injury to the pork loins from handling would require all sales to be made at a higher price. Respondent does not attack the practice of selling by the "boxed weight" method, but finds unfair and unjust discrimination and a deceptive practice and device in "requiring one purchaser of its wrapped and packaged packer products to pay for them on the basis of their weight at the time they were wrapped and packed by respondent (petitioner) and allowing another purchaser to pay for such products on the basis of the actual weight thereof at the time of their physical delivery to the purchaser."

A search of the record reveals no evidence introduced by respondent from which it is possible to ascertain the price per pound charged on the "boxed weight" method and the price per pound charged on the "stripped weight" basis. Respond-

ent's brief contains the following statement: "In reaching such a conclusion (that sales by the two methods were at the same per pound prices) the Secretary was without the aid of any direct testimony that the prices were the same for the various purchasers. In order to establish this finding he was compelled to rely on inferences drawn from the testimony." We must assume that respondent uses the word "compelled" merely to indicate that the Secretary relied on inferences only because there was no direct evidence presented by the record. Respondent cannot mean that evidence on that question was not available. No reason is apparent why witnesses could not have been asked the price per pound which they paid, and officers and sales records of petitioner were available for the use of respondent.

In our opinion the evidence on which respondent relies for his "inferences" does not support the inferences. Respondent calls attention to the testimony of ten buyers who customarily stripped all meats of containers and weighed them, and who testified that they paid for the actual weight of the meat as thus stripped. There was no showing as to the price per pound paid by eight of the buyers; the showing was merely that they had purchased on a stripped weight basis. As to the remaining two buyers the evidence shows that they paid a higher price per pound, although respondent contends that the higher price was based upon special service alone. We shall discuss this contention later.

Four purchasers testified that they had tested the weight of certain boxes of meat and found that the weight of the meat stripped corresponded with the weight marked on the box. This testimony indicates that the buyers paid for actual weight received but does not indicate the price per pound. Three purchasers, all retail butchers, testified that they had obtained adjustments because of differences in marked weight and actual net weight at the time of delivery. The evidence in regard to the adjustments shows that such instances were so few as to be described as "rare and sporadic" and did not show a policy of preferring retail butchers over purveyors. Furthermore, it was assumed throughout the proceeding that if any preferences or advantages were given they worked to the advantage of the institutional trade and to the disadvantage of the purveyors; and re-

spondent states in his brief that the institutional trade for which petitioner and purveyors competed "just about includes the entire group of favored buyers." One of these butchers testified that he complained about a shortage and secured a compromise, but that he was advised that there would be no such adjustment thereafter. The necessary conclusion from the evidence respecting the so-called adjustments is that they were not the result of a policy or practice, but merely represented occasional concessions in the interest of good will.

The evidence establishes that the prices of meat fluctuate rapidly and that petitioner's salesmen have discretion to sell within a daily range, the range itself being subject to change during the same day. Before an actual discrimination can be established it must be shown that boxed weight purchasers were charged the same price per pound as purchasers who bought on the stripped weight basis. Upon the establishing of such actual discrimination there still remains the question whether such discrimination amounts to an unreasonable preference or advantage; and in connection with this point it is necessary to take into consideration the price range within which the salesmen could exercise discretion.

Respondent having called attention to the evidence above referred to, and other evidence of the same general purport, comments as follows: "Confronted with all this testimony, petitioner made no attempt to cross-examine any of the witnesses buying on the actual weight basis as to whether they paid a higher price than the listed market price." The foregoing suggests that respondent is not relying completely upon its contention that inferences established the fact that petitioner charged the same price per pound for meats sold both on the boxed weight and stripped weight bases, but also upon the proposition that the burden of proof was on petitioner to show that sales were not at the same price per pound. At another point in respondent's brief is found the statement that "petitioner was therefore confronted with the obligation of justifying this prima facie case of unjust discrimination." In support of the foregoing respondent cites American Can Co. v. Ladoga Canning Co.[13] and Hansen Packing Co. v. Armour & Co.[14] Respondent further states that "It (the petitioner) not only failed to do so, but the tes-

[13] 7 Cir., 44 F.2d 763. [14] D.C., 16 F.Supp. 784.

timony submitted by petitioner's own witness plainly establishes a contrary conclusion." Respondent's citations do not support his statement respecting the burden of proof and the evidence of petitioner's witnesses do not establish "plainly", or otherwise, the conclusion sought by respondent. The decision of this court in American Can Co. v. Ladoga Canning Co., supra, held that a case where actual price discrimination was established in a proceeding under the Clayton Act, 38 Stat. 730, the burden was on the defendant to prove a justification which was provided for in the same section of the act which defined the prohibited conduct, and this Court's citations in the opinion were to the effect that the burden of proving an exception in a statute is on the party who relies upon the exception, a proposition in conformity with the general rule. Hansen Packing Co. v. Armour & Co., supra, did not go beyond the American Can Co. case. In the instant case we do not have a showing of actual discrimination nor do we have any reliance upon a proviso. Respondent had at least the burden of establishing an actual discrimination.

The testimony of petitioner's witness, to which respondent refers as explaining the difference of prices per pound, related to sales to two customers of petitioner, the French Line and the Hotel New Yorker. They are the two buyers referred to above who always bought on the stripped weight basis, and who paid a price higher than the quoted price. In respect to these two buyers the testimony establishes that they paid higher prices than buyers who purchased on the boxed weight basis. This supports the contention of petitioner that a higher price was charged to stripped weight buyers and that as a consequence no preference in fact was given to them. But respondent contends that the testimony of a manager of a branch house of petitioner proves that the higher price paid was due entirely to the fact that these two purchasers required a special selection of meats. In response to a question as to the price charged the New Yorker the witness stated: "* * * they are higher but I want to explain that * * * Their specifications are higher than any other customer that we do business with as to selection and for that reason you have to charge more money for that selection." Respondent emphasizes the significance of the words "for that reason." This emphasis, however, distorts the testimony of the witness. He had previously testified as follows: "Taking the case of the account of the Hotel New Yorker, in addition to the fact that that hotel buys * * * on the basis of stripped net weight rather than boxed market weight, there is *another element* that enters into the price as to the Hotel New Yorker. They have to have a special selection." (our italics) The witness relied upon by respondent thus clearly negatived the inference respondent seeks to draw, namely, that only one element entered into the higher price. The auditor of petitioner presented an exhibit that shows that the New Yorker's per pound prices have run as much as five cents per pound higher than prices to purveyors. In this connection it should be noted that the evidence establishes a shortage of about three pounds per 100 pound lots. Consequently, on the basis of the average price per pound indicated by the evidence, a "stripped weight" purchaser who paid a cent per pound higher than the price quoted for the "boxed weight" meats would pay a higher price per pound for 100 pound lots than those who purchased on the "boxed weight" basis. Such higher price would compensate both for the difference in weight and for the extra service involved in selling on the stripped weight basis. Both go to make up the price. This was what the testimony of the witness taken as a whole indicates. Another witness for petitioner testified that when a customer wished to buy on a "stripped weight" basis petitioner would usually ask a cent a pound more, but that the increase in price would vary; that "there would be other factors that would enter into it"; that "it might be two or three cents as in the case, for instance of the New Yorker, where they not only required a stripped net weight, but they also required along with it a weight range narrower than we pack and a higher degree of selectivity * * *."

The evidence of petitioner is not self-contradictory on the point, as it must be in order to support respondent's statement "that the testimony submitted by petitioner's own witness plainly establishes" the conclusion that stripped weight buyers purchased at the same price per pound which was required of boxed weight purchasers.

■ Our study and analysis of all the evidence convinces us that there is no substantial evidence to support a finding that purchasers on the stripped weight basis

were given an actual preference or advantage over customers who purchased on the boxed weight basis.

Furthermore, the cease and desist order, insofar as it applies to the practice of selling by the boxed weight and stripped weight methods, must be set aside because of its form. It does not conform to the finding of fact and prohibits non-discriminatory practices as well as discriminatory. The finding of fact is that sales by both methods are made at the same per pound price. The order prohibits the petitioner from "requiring one purchaser * * * to pay * * * on the basis of * * * weight at the time (of packing) and allowing another purchaser to pay * * * on the basis of actual weight at the time of * * * delivery." No reference is made to a per pound price. The order in form prevents the petitioner's making sales by both methods whether or not the same per pound prices are charged. We cannot say, nor is it contended, that sales by both methods in order to meet the demands of customers is per se discriminatory. Both methods are available to all and unless some factor renders the methods, as employed, discriminatory there is no basis for the order to cease and desist from either of them. The order goes beyond requiring cessation of discrimination. In fairness, we assume, however, that the form of the order was due to inadvertence and without any intention to require the petitioner to abandon one of its methods of handling its products.

Petitioner urges that it was deprived of its constitutional rights to a full and fair hearing. But in our opinion the hearing met the requirements of a fair hearing, both in form and substance. We find nothing in the proceedings which comes within the condemnation of Morgan v. United States.[15]

Also we are convinced the evidence supports the Secretary's conclusion that the Metropolitan Company was petitioner's agent and that the transactions which are the subject of the investigation are transactions in interstate commerce, within the meaning of that term, as construed in the recent decisions of the Supreme Court.

Petitioner contends that *terms of credit* do not come within the purview of the act, and that as a matter of law the giving of preferences in respect to terms of credit can not violate the prohibitions of the act. In support of this contention petitioner cites Little Rock & M. R. Co. v. St. Louis S. W. R. Co.,[16] Gamble-Robinson Com'n Co. v. Chicago & N. W. R. Co.[17] and Gulf, C. & S. F. R. Co. v. Miami S. S. Co.[18]

The decision in Gamble-Robinson Commission Co. v. Chicago & N. W. R. Co., supra, holds that credit discrimination is not within the purview of the Interstate Commerce Act; and the court came to this conclusion even though the carrier acted in bad faith. There was a dissent in the case, the dissenting opinion stating "* * * if we do not regard the effect upon his business in its relation to the like business of his competitors, what conceivable test or standard is available?" It is clear that the dissenting opinion did not go farther than to insist that it was unlawful under the Interstate Commerce Act for a carrier to discriminate as to credit terms between competing shippers. As already pointed out, the discrimination which it is alleged that petitioner practiced in the instant case was not between competing customers of the petitioner. The majority opinion in Gamble-Robinson Commission Co. v. Chicago & N. W. R., supra, emphasized especially that a "refusal to extend credit to a purchaser of goods * * * of financial responsibility, credit and reputation equal to those of others to whom such credit is extended does not in the nature of things subject him to an undue or unreasonable prejudice or disadvantage, while the requirement that such a vendor shall extend equal credit to all purchasers of equal financial responsibility, credit, and reputation, would subject him to unreasonable and undue disadvantage." And the opinion of the court contained the further statement that "there are other considerations besides financial responsibility, credit, and reputation, * * * such as the experience of the seller or the loaner, the habits of the purchaser or the borrower, his fairness and promptness."

Respondent cites and relies strongly upon the case of People ex rel. Western

---

[15] 298 U.S. 468, 56 S.Ct. 906, 80 L. Ed. 1288.

[16] 8 Cir., 63 F. 775.

[17] 8 Cir., 168 F. 161, 172, 21 L.R.A., N.S., 982, 16 Ann.Cas. 613.

[18] 5 Cir., 86 F. 407. See, also, Annotation "Discrimination by Public Utility Company in respect of Extension of Credit," 12 A.L.R. 964.

Union Telegraph Co. v. Public Service Commission [19] to support its contention that credit terms may create unreasonable preference. The decision in the foregoing case supports respondent's general proposition, but it is distinguishable upon its facts from the instant case. The Postal Telegraph Company accepted telegrams destined for places not reached by its wires, and presented these telegrams to Western Union Telegraph Company for transmission. The defendant frequently granted credit terms to customers and for thirty years it regularly had granted credit to the Postal Company. Western Union ceased giving credit to the Postal Company but continued to give credit to other telegraph companies. No competitive advantage was served by such cessation of credit and it appears from the facts that the giving of credit was discontinued only when the Postal Company refused to maintain rates as high as those of the defendant, Western Union. The New York law provided that telegraph corporations "* * * shall receive dispatches from and for other telegraph * * * corporations, and * * * transmit the same with impartiality and good faith * * *" Transportation Corporations Law N. Y., Consol.Laws c. 63, § 103. Another act [20] provided that no telegraph company shall give an unreasonable preference or advantage or subject any particular corporation to unreasonable prejudice. The court held that defendant had not treated the Postal Company "with impartiality." Compared to the facts of the instant case it appears that the following distinguishing factors exist: (1) competition with other telegraph companies was not a material factor, while in the instant case competition between petitioner and other packers is a factor; (2) competition with the Postal Company was not a substantial factor in the decision to discontinue credit, while in the instant case competition with the purveyors does enter into the question of terms of credit to the consumer trade; (3) Western Union discriminated as between telegraph companies, that is between members of a class engaged in the same business, while in the instant case discrimination is between consumer purchasers of petitioner and jobber purchasers of petitioner; (4) The Western Union and Postal Company were under special and reciprocal legal duties as public service companies.

We are not prepared to say that a course of discrimination in terms of credit engaged in for the purpose of injuring a particular person or locality, or necessarily resulting in injury, could be said, as a matter of law, not to come within the prohibitions of Section 202 (b) of the Packers and Stockyards Act; and it is easily conceivable that such conduct could offend against clause (a) which makes it unlawful to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce. But on the evidence and the findings of the Secretary no such case is presented here.

Petitioner takes the position that the order insofar as it is directed to the giving of terms of credit is bad because of the indefiniteness of the standard of conduct which is required of the petitioner. The order requires the petitioner to "cease and desist from engaging in the unfair, unjustly discriminatory and deceptive practice and device of denying to any buyer of packer products the same terms of credit that are extended to any other buyer, of substantially the same credit rating, purchasing packer products of like kind, quantity and quality, under substantially the same circumstances." We are of the opinion that there is merit in the petitioner's contention, and also we think the test of "credit rating" is an unreasonable and impracticable one because it requires the petitioner to assume all the burden and risk incident to personal idiosyncracies of buyers.

But we think the order is fundamentally defective and in violation of petitioner's rights in that it compels petitioner, under the business facts disclosed by the record, either to give up its lucrative business with the institutional buyers or to extend 30 days credit to all of its customers who can show a credit rating substantially the same as that of any one of the institutional customers, even the one having the lowest credit rating. In substance the order is much more than a cease and desist order. It is an affirmative command to extend credit to all customers for a term of 30 days or more or else withdraw from that part of the institutional trade which refuses to buy except upon such terms of credit. Perhaps the fundamental difficulty is that the Secretary of Agriculture is in fact attempting to exercise authority to enforce

---

[19] 230 N.Y. 95, 129 N.E. 220, 12 A.L.R. 960.

[20] Public Service Law N.Y., Consol. Laws N.Y. c. 48, § 91(3).

uniformity of discount terms, terms of credit, and trade practices in the business of distribution of packers' products. We do not think that the Packers and Stockyards Act confers such extensive authority upon the Secretary. In our opinion the Secretary is authorized under Section 203 only to require packers to cease and desist from engaging in conduct which is prohibited by the section. The act prohibits the making or giving of any undue or unreasonable preference or advantage to any particular person or locality, or subjecting any particular person or locality to any undue or unreasonable prejudice or disadvantage. Neither a discount nor a term of credit can be an undue or unreasonable preference or advantage if it is a reasonable discount or term of credit; and whether it is, must be determined in the light of business realities and accepted standards of fairness in business relations, assuming, of course, that there is no valid rule of law which exacts a higher standard of business conduct than is required by the accepted standard of fairness in the business. If a practice in respect to the giving of discount or terms of credit in fact constitutes an undue and unreasonable preference or advantage, or subjects some person or locality to undue or unreasonable prejudice or disadvantage, then clearly the Secretary of Agriculture has the power to restrict the practice to the point where it is fair and reasonable; but we do not believe that the Secretary has the power to change a practice, which is assumed to be unreasonable and to create an unreasonable preference, into a proper practice by requiring it to be extended to all others who may be affected thereby. In short, our position is that under Section 202 the Secretary has no power to require petitioner to give discounts or particular terms of credit to any customer as a condition to being permitted to continue giving terms of credit or discounts which are claimed to be unreasonable and prejudicial.

Furthermore, as already indicated, it is our opinion that discounts, terms of credit and trade practices followed in the handling and distribution of packer products which can be said to be fairly required by the exigencies of the business and which are justified by the standards of the business and are not obnoxious to any requirements of law cannot be held to conflict with any of the prohibitions of Section 202.

It is true that respondent contemplates removing from the picture any competitive need for differences in discounts and terms of credit and trade practices generally by eventually issuing cease and desist orders of the type utilized in the instant case against all who are engaged in the distribution of packer products. Whether such a result is desirable as a matter of policy is not for this Court to say. But it is obvious that such a program, which necessarily would include not only the New York City area but also the national area, presupposes a power at least as comprehensive as the power of the Interstate Commerce Commission in its field, and such as can be exercised effectively only by treating the packing industry as a public utility. We find no evidence in the Packers and Stockyards Act of an intention by Congress to confer such a power upon the Secretary of Agriculture.

The petition to set aside the order of the Secretary is granted and the order is set aside.