Henry Lee PICKETT, et al., Plaintiffs,

v.

TYSON FRESH MEATS, INC., Defendant.

No. CIV. 96–A–1103–N.

United States District Court, M.D. Alabama, Northern Division.

April 23, 2004.

Andrew Clay Allen, Joe R. Whatley, Jr., Peter Harrington Burke, Whatley Drake LLC, Ernest Clayton Hornsby, Jr., Morris Haynes & Hornsby, Birmingham, AL, David A. Domina, Nora M. Kane, Domina Law PC, Omaha, NE, Larry Wade Morris, Morris, Haynes & Hornsby, Alexander City, AL, Pierce Jackson Harris, Jr., Beard & Beard, Guntersville, AL, Stephen K. Griffith, Knight Griffith McKenzie Knight McLeroy & Little LLP, Cullman, AL, for Plaintiffs.

Randy Beard, Beard & Beard, Guntersville, AL, for Plaintiffs and Amicus. John E. Bloomquist, Doney, Crowley & Bloomquist, P.C., Helena, MT, David G. Velde, Gaffaney & Velde, Alexandria, MN, Charles F. Holum, Denver, CO, Page Dringman, Dringman & Redmon, Big Timber, MT, Jay N. Galt, Marjorie McCullough Galt, White, Coffey, Galt & Fite, Oklahoma City, OK, Robert Dudley Blackman, Colorado Cattlemen's Association, Pueblo, CO, David A. Bradsky, Bradsky, Bradsky & Bradsky, PC, Rapid City, SD,

Gordon W. Schnell, Mackoff Kellogg Law Firm, Dickinson, ND, Lynn A. Hayes, Farmers' Legal Action Group, Inc., St. Paul, MN, Richard A. Carlson, Filer, ID, Scott Polikov, Austin, TX, Kenneth E. Vines, U.S. Attorney's Office, Montgomery, AL, for Amicus.

Bartholomew L. McLeay, Thomas J. Kenny, Kutak Rock LLP, Omaha, NE, Charles W. Douglas, Louis E. Fogel, Susan A. Stone, William H. Baumgartner, Jr., Sidley Austin Brown & Wood, Patrick J. Heneghan, Schopf & Weiss, Chicago, IL, Frank Robert Volpe, Jay T. Jorgensen, Kristin G. Koehler, Mark Daniel Hopson, Thomas C. Green, Sidley Austin Brown & Wood, Washington, DC, George Walton Walker, III, Lee Hall Copeland, Richard Hamilton Gill, Copeland Franco Screws & Gill, Montgomery, AL, Nathan Hodne, Tyson Foods, Inc., Asst. General Counsel, Springdale, AR, for Defendants.

## MEMORANDUM OPINION

STROM, Senior District Judge.

This matter is before the Court on defendant Tyson Fresh Meats, Inc.'s motion for judgment as a matter of law, or for new trial (Filing No. 664), filed with the Court on February 25, 2004.

### I. Background

Trial of this case began on January 12, 2004. On January 30, 2004, plaintiffs rested and defendant moved for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. The Court took defendant's motion under advisement. Defendant then presented its evidence and plaintiff presented rebuttal evidence. All parties rested on February 5, 2004. Defendant renewed its motion for judgment as a matter of law, and the plaintiff also moved for judgment as a matter of law. These motions were taken under advisement. The Court submitted the case to the jury on February 10, 2004.

On February 17, 2004, the jury returned a verdict. The jury answered five interrogatories affirmatively on the verdict form, finding that plaintiffs established, by a preponderance of the evidence, that (1) there is a nationwide market for fed cattle; (2) defendant's use of captive supply had an anticompetitive effect on the cash market for fed cattle; (3) defendant lacked a legitimate business reason or competitive justification for using captive supply; (4) defendant's use of captive supply proximately caused the cash market price to be lower than it otherwise would have been; and (5) defendant's use of captive supply injured each and every member of plaintiffs' class. In addition, the jury found that defendant's use of captive supply damaged the cash market price of fed cattle sold to defendant during the class period by One Billion, Two Hundred Eighty One Million, Six Hundred Ninety Thousand Dollars ($1,281,690,000.00).

Subsequently, the defendant filed a motion for judgment as a matter of law or for new trial with a supporting brief. Plaintiffs filed a brief in response and defendant filed a reply brief. The Court has reviewed the briefs as well as pertinent parts of the trial record and now concludes that plaintiffs' motion for judgment as a matter of law should be denied, and defendant's motion for judgment as a matter of law should be granted on the grounds discussed herein and for the following reasons.

### II. Discussion

1. Standard of Review

 In reviewing defendant's motion for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, the Court considers whether sufficient conflict exists in the evidence to necessitate allowing the jury verdict to stand, or whether the evidence is so weighted in favor of the defendant that the

defendant must prevail as a matter of law. *Thosteson v. United States,* 331 F.3d 1294, 1298 (11th Cir.2003) (citing *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1244 (11th Cir.1999) (en banc)). Although the Court reviews the evidence in the light most favorable to the plaintiffs, and draws all reasonable inferences in favor of the plaintiffs, the plaintiffs "must put forth more than a mere scintilla of evidence suggesting that 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.'" *Thosteson,* 331 F.3d at 1298 (citing *Mendoza,* 195 F.3d at 1244) (quoting *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995)). The existence of a genuine issue of material fact precludes judgment as a matter of law, but the presence of "a mere scintilla of evidence" does not create a genuine issue of material fact. *Mendoza,* 195 F.3d at 1244. The Court is mindful of this standard as it analyzes the issues presented in defendant's motion.

### 2. Analysis

Defendant sets forth numerous arguments for why the Court should grant its motion for judgment as a matter of law. Defendant contends that there is no legally sufficient evidentiary basis for a reasonable jury to have found (1) a nationwide market for fed cattle; (2) that defendant's use of marketing agreements and forward contracts had an anticompetitive effect; (3) that defendant lacked a legitimate business reason or competitive justification for using captive supply; (4) that defendant's use of captive supply caused the cash market price to be lower; (5) that each member of the class suffered impact or injury; and (6) that there were damages sustained from the alleged violations of the Packers and Stockyards Act. See Filing No. 665. Plaintiffs, however, argue that the record contains evidence such that a reasonable jury could find in favor of plaintiffs on each essential element of their claim.

#### a. Legitimate Business Justifications for Using Captive Supplies

The Court finds that the evidence is insufficient to support a finding that defendant lacked a legitimate business justification for its use of captive supplies.[1] Plaintiff attempts to counter this argument by arguing that (1) there is a less restrictive manner in which defendant could achieve the same benefits (i.e., through the cash market); and (2) defendant's justification of "meeting the competition" is invalid because defendant cannot justify its unlawful behavior by competing with other unlawful behavior. The Court will consider each of these two arguments.

■ First, plaintiffs argue that they were entitled to show that there was a less restrictive way of achieving the same business justifications. Plaintiffs contend that they established at trial that defendant could achieve all of its claimed justifications through purchases on the cash market, which would constitute a less restrictive manner of achieving the justifications.

In response to defendant's motion for judgment as a matter of law, plaintiffs attempt to rebut several of defendant's

---

1. Although the marketing arrangements have been generally referred to in this case as "captive supply," that label is somewhat of a misnomer. As an initial matter, these marketing arrangements were initiated by cattle producers starting back in the early 1980's. The evidence is undisputed that, at least with respect to some of the marketing agreements, the producer had no obligation to deliver the cattle to the packer until such cattle were designated by the producer for delivery. The defendant's obligation to purchase the cattle did not attach until such delivery designation occurred, which usually was not until two weeks before delivery.

claimed business justifications by arguing that those justifications could be achieved on the cash market. During the conference on jury instructions in this case, plaintiffs requested that the Court instruct the jury that, if defendant could achieve its claimed justifications in the cash market, then such justifications were not "legitimate" business justifications. See Trial Transcript 2/9/04 at 3107:10—3108:10; 3111:12—3112:8; 3119:18–24. After reviewing the issue, the Court rejected that argument. See Jury Instruction No. 16. The Court adheres to its earlier position and finds that the "less restrictive alternative" argument offered by plaintiffs is without merit. The Court's position is supported by an abundance of case law. See generally *Armour & Co. v. United States*, 402 F.2d 712, 725 (7th Cir.1968); *Griffin v. Smithfield Foods, Inc.*, 183 F.Supp.2d 824, 827–28 (E.D.Va.2002); *Jackson v. Swift–Eckrich, Inc.*, 836 F.Supp. 1447 (W.D.Ark.1993), *aff'd*, 53 F.3d 1452 (8th Cir.1995).

Absent the "less restrictive alternative" argument, the trial record is barren of any evidence which would permit the jury to conclude that defendant lacked a legitimate business justification for its use of captive supply. The evidence reveals that captive supply transactions permit defendant to achieve a reliable and consistent supply of fed cattle, allowing it to operate its plants in an efficient manner. Numerous witnesses, called by both the plaintiffs and defendant, confirmed that the use of captive supply helps defendant ensure a reliable and consistent supply of fed cattle. Plaintiffs claim that such justification is not a "legitimate" justification because defendant could achieve those same results on the cash market. Filing No. 678 at 34–35, ¶¶ 80–81. Plaintiffs apparently do not contest the fact, however, that the use of captive supply does indeed lead to a consistent and reliable supply of fed cattle. A packer does not violate the Packers and Stockyards Act when its conduct is undertaken "in order to have a more reliable and efficient method of obtaining a supply of cattle." *IBP, Inc. v. Glickman*, 187 F.3d 974, 978 (8th Cir.1999).

Defendant also produced evidence at trial that it was justified in acquiring cattle through captive supply transactions because it needed to do so to "meet the competition." Defendant argues that the evidence is undisputed that it would lose sources of cattle if it did not offer arrangements with cattle producers that its competitors such as Swift and Excel were offering. Plaintiffs, however, argue that this cannot qualify as a legitimate business justification because the defendant cannot "engage in illegal activity to compete with another who is breaking the law. One wrong is not set right by more wrongs." Filing No. 678 at 35, ¶ 82.

Plaintiffs' argument on this issue is flawed. The evidence at trial was undisputed that if defendant was unable to offer captive supply arrangements to producers, it would have a much smaller pool of producers from which to buy cattle because those producers wishing to sell cattle via marketing agreements, formula sales, or forward contracts would sell their cattle to defendant's competitors. This would pose problems for the defendant, as it would have fewer cattle to choose from, and the quality and reliability of its cattle supply would likely suffer. Thus, defendant needed to use these sources of supply to be able to compete effectively with Excel, Swift, and other packers.

Defendant's use of captive supply arrangements is supported by the legitimate business justification of competing in the industry. Plaintiffs did not offer any evidence at trial suggesting that the defendant would be able to compete if the competitors were allowed to continue to use captive supply, but defendant was forced

to discontinue such procurement methods. See *Swift & Co. v. Wallace*, 105 F.2d 848 (7th Cir.1939) (setting aside a finding of "unreasonable preference" where the packer had extended allegedly preferential credit terms in *bona fide* response to its competition offering the same terms).

■ Although the record indicates that defendant's competitors do utilize marketing agreements, forward contracts, and other forms of captive supply transactions, it is significant that there is no evidence before the Court to suggest that such conduct is illegal. The use of marketing agreements, joint ventures and forward contracts is not, *per se*, violative of the Packers and Stockyards Act. Generally, such conduct only amounts to a violation of the Act if it constitutes an "unfair practice," involves price manipulation, or violates some other specific provision of the Act. There is no evidence that defendant's competitors' use of these supply arrangements violated the Act, nor is there any evidence that the use of such arrangements is *per se* illegal.

#### b. Damages to All Class Members

■ The Court finds that the evidence does not support a finding that each member of plaintiffs' class was injured. In Instruction No. 19, the Court instructed the jury:

> To establish that IBP's use of captive supply caused an injury to each and every member of the plaintiff class, plaintiffs need not prove such injury with exactitude, but must establish that the members of the class were injured in some measurable amount. Remember, throughout your deliberations, you must not engage in any speculation, guess, or conjecture. Instruction No. 19.

Plaintiffs' expert, Dr. Robert Taylor, testified that defendant's use of captive supply did not have a statistically significant impact on the cash market price for fed cattle during the years 1999 and 2000. See Trial Transcript 2/5/04 at 3040:3–13; 3051:22—3052:17. Presumably, there are class members whose cash market sales of fed cattle to defendant are limited to the years of 1999 and 2000; if so, the evidence does not establish that those class members suffered any adverse impact or injury. In this case, the fact-finder is left to speculate as to whether any such class members suffered an adverse impact or injury during these two years, and the jury verdict cannot be based on such speculation or conjecture. Plaintiff's problems of proof on this issue are further compounded by their inability to identify the current members of the class, or even the number of class members. The Court is mindful that plaintiffs were not required to prove damages with exactitude, but the Court is satisfied that plaintiffs have not met their burden on this issue.

#### c. Class-wide Damages

■ Plaintiffs' evidence at trial failed to establish damages or, in the alternative, a formula from which damages could be calculated at a later claims procedure. Defendant argues that plaintiffs had the burden at trial "of either proving damages to the class *or* of establishing a formula that could be used to establish damages in a later proceeding." Filing No. 665. Defendant correctly points out that plaintiffs did not prove, at trial, the extent of class-wide damages or the volume of class members' sales on the cash market. Because plaintiffs' evidence of damages included damages caused to the entire cash market, including damages suffered by non-class members, defendant argues that plaintiffs' damages evidence at trial is "completely irrelevant." Defendant contends that the jury did not adopt a formula for calculating damages in a claims process, and that the absence of such formula precludes any claims proceeding in the future.

On July 16, 2003, the Court proposed bifurcating the trial. See Filing No. 511. Under the Court's proposal, the parties would have first tried this case to a jury solely on the issue of liability. If the jury returned a verdict in favor of plaintiffs, the Court proposed that a trial on damages would immediately commence before the same jury. Upon proposing that procedure, the Court ordered the parties to show cause why such procedure would not be an appropriate manner in which to proceed with trial.

Plaintiffs opposed the Court's proposal. See Filing No. 520. Plaintiffs noted that "bifurcation must be undertaken in such a way that the second phase of a trial, governing damages, becomes little more than an application of the formula found by the jury in the first phase." Filing No. 520 at 1–2. Plaintiffs argued that the "interwoven nature" of the evidence in this case "makes bifurcation of liability from damages unworkable," and further noted that "proof of liability and damages are largely inseparable." Filing No. 520 at 3, ¶¶ 7–8. At that time, plaintiffs argued that "the initial phase of the trial, including the determination of liability and class-wide damages should not be bifurcated." *Id.* at 5, ¶ 17.

The Court subsequently decided not to bifurcate the trial. As such, plaintiffs were required to prove, at the initial trial of this case, the existence and amount of damages to the class, or a formula from which individual damages could later be calculated. Plaintiffs failed to make such a showing at trial. Absent a finding from the jury on the class-wide damages, plaintiffs now seek to determine individual damages in a subsequent claims procedure, the formula for which has not been established by plaintiffs, and none can be developed from the jury's verdict.

Dr. Taylor testified that in his opinion, the damages to the cash market as a whole was an amount slightly in excess of $2.1 billion. He had prepared an exhibit (Exhibit 1221), reflecting how he arrived at that figure. However, that exhibit is of no help in devising a formula by which damage to individual class members can be calculated. The jury obviously disagreed with his calculations, returning a verdict of $1,281,690.00.[2] The manner in which the jury derived that dollar amount is currently unknown, and it would be impermissible for the Court to speculate as to the basis upon which the jury found that amount to be the correct calculation of damages. The jury also found that the defendant's use of captive supply did not have an equal percentage effect on the cash market price for fed cattle for each year during the class period. This finding, too, is problematic for plaintiffs, as they essentially failed to establish a viable formula for computing damages for individual members of the class. As such, the Court is left without any formula or method from which a magistrate judge or special master could calculate damages on an individual basis in a future claims procedure.

The Court recognizes that the jury was never asked to quantify damages suffered solely by class members. Rather, the Court framed a question on the verdict form such that the jury was asked to determine damages to the entire cash market during the class period. Such question was posed to the jury primarily because plaintiffs' evidence did not permit a finding of any other sort. Had the jury been asked to quantify the damages suffered solely by class members, there is no doubt that the evidence adduced at trial would have been insufficient to support any such finding, as plaintiffs' experts failed to de-

2. The Court has previously declined to enter judgment on the jury's finding of damages to the market in the amount of $1,281,690,000. See Filing No. 675.

velop a model from which such conclusion could be drawn.[3] The plaintiffs have failed to carry their burden on the issue of damages to members of the class.

For the aforementioned reasons, the Court finds that plaintiffs failed to present evidence at trial to sustain their burden with respect to both liability and damages. For the foregoing reasons, the Court will grant defendant's motion for judgment as a matter of law.

Also before the Court is a motion for pro hac vice admission filed by Roger A. McEowen (Filing No. 679); and a motion to submit an amici brief (Filing No. 680) which was included with the motion and affidavit. After review, the Court finds said motions should be denied. A separate order will be entered in accordance with this memorandum opinion.

---

**3.** The Court notes that IBP's average cattle cost is virtually identical to the USDA average market price, indicating that the defendant paid the same amount for its cattle as the other market participants during the class period. See Filing No. 1213A. Plaintiffs contended that IBP was the price leader, but the evidence of both parties is inconsistent with a finding of such price leadership.