# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3104

_____

|  |  |  |
|---|---|---|
| IBP, Inc., | * | |
| | * | |
| Petitioner, | * | |
| | * | Petition for Review from the Decision |
| v. | * | of the United States Department |
| | * | of Agriculture. |
| Daniel Glickman, Secretary, U.S. | * | |
| Department of Agriculture; United | * | |
| States Department of Agriculture, | * | |
| | * | |
| Respondents. | * | |

_____

Submitted:  April 22, 1999

Filed: August 13, 1999

_____

Before BEAM and HANSEN, Circuit Judges, and MOODY,[1] District Judge.

_____

BEAM, Circuit Judge.

IBP, a large meat packing company, appeals a Judicial Officer's (JO) decision finding a provision of its agreement with a group of feedlots to be a violation of the Packers and Stockyards Act (the Act).  7 U.S.C. § 192(a)-(b).  The suspect provision is a right of first refusal, which the JO found to have the effect or potential effect of

_____

[1]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas, sitting by designation.

suppressing or reducing competition. As a result, the JO ordered IBP to cease and desist entering into or continuing any agreement "containing a right of first refusal which provides [that IBP] may obtain livestock by matching the highest previous bid." We reverse and vacate the order.

## I.    BACKGROUND

In January 1994, a group of Kansas feedlots, collectively known as the "Beef Marketing Group," (BMG) approached IBP with a proposal for the sale of livestock. The two entered into a "Beef Marketing Agreement" (the Agreement) that establishes terms and procedures for the sale of cattle which differ from traditional methods.

Under the Agreement, IBP makes an initial bid on a pen of BMG cattle. The initial bid is based upon the midpoint between the highest purchase price reported by the United States Department of Agriculture (USDA) in a given week in Kansas for at least 2,500 cattle and the highest price IBP paid for the same number of cattle in Kansas during the week (midpoint price hereafter referred to as the Kansas High Price). BMG members can then accept or reject the bid. If IBP's bid is rejected, then other cattle buyers bid. However, as long as IBP's initial bid is no less than "minus fifty," i.e. $0.50 per hundredweight less than the Kansas High Price, IBP has a right of first refusal on that pen of cattle. Therefore, once others have completed bidding, BMG member feedlots must offer the pen of cattle to IBP at the highest bid price. In the event that IBP elects to exercise the right of first refusal, then BMG members can go back to the high bidder in an attempt to get an increased bid. After all bidding is completed though, IBP may still obtain the pen of cattle by matching the highest bid.

Originally, there were nine BMG-affiliated feedlots that joined the Agreement. Two feedlots later opted-out of the Agreement. IBP also continued to buy cattle from other feedlots that were not affiliated with BMG and with whom IBP had no similar agreement.

In August 1995, the USDA[2] filed a complaint alleging that the Agreement violates section 192(a)-(b) of the Act.[3] A hearing was held before an Administrative Law Judge (ALJ). At the hearing, the USDA first argued that the Agreement contained no benefit for IBP, and therefore granted the BMG members an undue or unreasonable preference or advantage (or subjected non-BMG members to undue or unreasonable prejudice or disadvantage) in violation of the Act. In response, IBP proved that there was, among other benefits, a valuable right of first refusal, whereupon the USDA challenged the right of first refusal as a violation of the Act. The ALJ concluded that there was no violation of the Act. The USDA appealed and a hearing was held before the JO acting as final deciding officer for the USDA.

---

[2]While the Deputy Administrator in the Packers and Stockyards Administration filed the complaint, for purposes of this opinion, we will refer to the complainant as the USDA.

[3]The Packers and Stockyards Act provides in pertinent part:

> It shall be unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
> (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

7 U.S.C. § 192 (a)-(b).

The JO agreed with most of the ALJ's findings, and found that owners and operators of non-BMG feedlots were not harmed[4] by the Agreement and that the USDA had not proven that the Agreement caused injury to cattle producers. He conceded that IBP, on average, paid a *higher* price for cattle purchased under the terms of the Agreement. Furthermore, the JO found that the Agreement does not provide an *undue* or *unreasonable* preference or advantage to BMG members. Nevertheless, the JO found that IBP's right of first refusal under the Agreement, has the effect or potential effect of reducing competition because IBP does not have to participate in bidding after its initial bid, and can obtain a pen of cattle by matching, instead of exceeding, the highest bid. Based upon this finding, the JO concluded that the "right of first refusal obviates [IBP's] need to compete" and therefore violates the Act.

## II.    DISCUSSION

"The findings of the [JO] must be sustained by this court if supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Farrow v. USDA, 760 F.2d 211, 213 (8th Cir. 1985) (quoting Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 477 (1951)). Thus, we review whether there is substantial evidence to support the JO's finding that IBP's right of first refusal has the effect or potential effect of suppressing or reducing competition. See id. We consider first the actual effect and then the potential effect.

It is clear that the Agreement, with its right of first refusal, has not had the actual effect of suppressing or reducing competition. IBP, "on average, paid a higher price for cattle purchased under the terms of the Beef Marketing Agreement than it did on other transactions" with other feedlots. Joint Appendix at 36 (opinion of the JO). The JO concluded that the USDA did not prove that the Agreement caused injury to non-

---

[4]The USDA even admitted that non-BMG feedlots continued to receive competitive prices despite the Agreement.

BMG feedlots or cattle producers. There is also no claim that other packers were harmed as a result of the Agreement. Thus, there is no substantial evidence to support the notion that the right of first refusal actually suppressed or reduced competition.

The Act, however, "does not require the [USDA to] prove actual injury before a practice may be found unfair," and in violation of the Act. Farrow, 760 F.2d at 215. A potential violation can suffice. "'[T]he purpose of the Act is to halt unfair trade practices in their incipiency, before harm has been suffered.'" Id. (quoting De Jong Packing Co. v. USDA, 618 F.2d 1329, 1336-37 (9th Cir. 1980)). As earlier noted, the JO found that the right of first refusal has the potential effect of suppressing or reducing competition.

We have said that "a practice which is likely to reduce competition and prices paid to farmers for cattle *can be* found an unfair practice under the Act, and be a predicate for a cease and desist order." Id. at 214 (emphasis added); see also id. at 215 (finding "'[t]he lack of competition between buyers, with the attendant possible depression of producers' prices, was one of the evils at which the Packers and Stockyards Act was directed'") (quoting Swift & Co. v. United States, 393 F.2d 247, 254 (7th Cir. 1986)). However, we are also mindful that the purpose behind the Act "was not to so upset the traditional principles of freedom of contract," as to require an entirely level playing field for all. Jackson v. Swift Eckrich, Inc., 53 F.3d 1452, 1458 (8th Cir. 1995) (finding that the Act does not statutorily create an entitlement to have the same type of contract as that offered to other independent growers); see also Mahon v. Stowers, 416 U.S. 100, 107-08 (1974) ("[T]here is no indication that, lurking within this intention to control deceptive and monopolistic practices in the packing industry, lies a further intention to guarantee persons who sell cattle to such packers a special favored position . . . .").

The USDA argues that the mere potential suppression or reduction of competition violates the Act. Yet, the "'chief evil' at which [the Act] was aimed was

'the monopoly of the packers, enabling them *unduly* and *arbitrarily* to lower prices to the shipper who sells, and *unduly* and *arbitrarily* to increase the price to the consumer who buys.'" Mahon, 416 U.S. at 106 (emphasis added) (quoting Stafford v. Wallace, 258 U.S. 495, 514-15 (1922)). The statutory language requires that the practice or device be unfairly or unjustly discriminatory and not merely discriminatory. See 7 U.S.C. § 192(a). Even the JO recognized that while the Agreement discriminates and gives an advantage or preference, the Agreement does not do so unduly, as required for a violation of the Act. We similarly conclude that the right of first refusal does not potentially suppress or reduce competition sufficient to be proscribed by the Act.

The USDA contends that the right of first refusal violates the Act because IBP does not have to participate in the bidding after they have made their initial bid. This is not an accurate characterization. Once a BMG member rejects the initial IBP bid, the bidding is open for all others. After the bidding is open to all, IBP must bid at least the same amount as the highest bidder in order to obtain the cattle. The bidding does not end there; the record shows that once IBP decides to exercise its right of first refusal, the feedlot-seller can then go back to the high bidder in an attempt to get an even higher price. When all is said and done, IBP can choose to match the highest bid, and thereby obtain the pen of cattle. This demonstrates that IBP does participate in the bidding process, even after the initial bid stage, and pays prices that are the result of the bidding process. The record demonstrates that the right of first refusal is an effort by IBP to have a more reliable and efficient method of obtaining a supply of cattle. "The [Act] was designed to promote efficiency, not frustrate it." Jackson, 53 F.3d at 1458.

Furthermore, in order to have the right of first refusal, IBP's initial bid must have been no less than $0.50 per hundred weight below the Kansas High Price. The USDA apparently would like the initial bid to not be considered for purposes of determining whether the right of first refusal provision violates the Act. However, IBP's initial bid is a condition precedent to the right of first refusal and cannot be disregarded. The

presence of the initial bid at a fair market price, with the feedlots' attendant right to accept or reject the bid, essentially ensures that the potential for undue or arbitrary lowering of prices is eliminated. Cf. Mahon, 416 U.S. at 106 (stating that the undue or arbitrary lowering of prices was the chief evil for which the Act was designed); Bruhn's Freezer Meats of Chicago, Inc. v. USDA, 438 F.2d 1332, 1337 (8th Cir. 1971) (stating that the purpose of the Act is to assure that farmers and ranchers do not receive less than market value for their livestock). The USDA's complaint itself states that the Agreement "guarantee[s] a high price for livestock purchased from the [BMG]." So, whether the right of first refusal is considered in isolation, or together with the rest of the Agreement, there is no violation of the Act.

## III.   CONCLUSION

For the foregoing reasons, we reverse the decision of the USDA and vacate the cease and desist order.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.