[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 16, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12137

_____

D. C. Docket No. 96-01103-CV-N

HENRY LEE "LEROY" PICKETT,
MIKE CALLICRATE, et al.,

Plaintiffs-Appellants,

versus

TYSON FRESH MEATS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(August 16, 2005)

Before CARNES and COX, Circuit Judges, and MILLS*, District Judge.

_____

* Honorable Richard Mills, United States District Judge for the Central District of
Illinois, sitting by designation.

CARNES, Circuit Judge:

Henry Lee Pickett is the owner of a cattle-producing farm located thirty-five miles south of Montgomery, Alabama. In this class action lawsuit he is the lead plaintiff representing a national class of cattle producers who sell their fed cattle—cows raised specifically for slaughter—to meat-packing plants exclusively on the cash market.

Tyson Fresh Meats, Inc., formerly Iowa Beef Processors, Inc. (IBP), is the largest meat-packing company in the United States. It processes thirty-five to forty percent of the steaks, hamburgers, and other consumer beef products sold in restaurants and supermarkets nationwide. Tyson purchases some cattle on the cash market from producers like Pickett. Since 1994 Tyson has also purchased a significant portion of its cattle through marketing agreements with cattle producers instead of from the cash market.

Pickett contends that Tyson has used marketing agreements to deflate the price of fed cattle on the cash market and the market as a whole in order to reap the benefits of lower prices. To stop Tyson from using marketing agreements and to recover for losses incurred from the lower prices that resulted on the cash market, Pickett sued Tyson. He brought the lawsuit on behalf of all cash market sellers claiming that Tyson had engaged in unfair practices and manipulated prices in violation of the Packers and Stockyards Act of 1921, 7 U.S.C. § 181 et seq.

2

The issues this case raises, and its procedural history, are best understood after a discussion of the cattle and meat-packing industries and the market where they meet.

**I.**

"Fed cattle" are born, raised, and marketed exclusively for slaughter. The process begins with the birth of a calf on a cattle-producing farm which exists solely to breed and raise cattle, feed them, and then sell them to meat-packing plants for processing into beef products. The first 200 days of a calf's life are spent feeding from her mother. After that, the calf is weaned and spends the next 200 days eating feed, grass, or wheat.

After the calf has been fed for 400 days, the producer sends it along with all the other calves being raised at the same time to a feed yard. The feed yard is a farm specifically designed to feed the calves intensively so they are in peak condition when sold to the meat packers. Some producers have feed yards on their farms, while others send their calves to third party feed yards which not only finish feeding them but also broker the cattle to the meat packers on the producer's behalf.

At the feed yards, each calf is put into a pen with fifty to 200 other calves for the intensive feeding program, which usually lasts 120 days. When the feeding program is finished, each animal ideally weighs 1250 pounds, the industry's target

weight.

Once the cattle in a pen have been fed intensively for 120 days, and have hopefully reached the target weight, they must be sold to a meat-packing plant within two weeks. If the fed cattle are not sold within that time period, they become too expensive for the feed yard to maintain and also become less desirable to the meat packers. They become too expensive because cattle gain usable weight more slowly after reaching 1250 pounds and eventually stop gaining it at all, but they still must be fed. They become less desirable to meat packers because the cattle start to gain more fat and the market is for meat not fat. The point is that the two-week window for selling fed cattle after they have been at a feed yard for 120 days is critical to the producers, the feed yards, and the meat packers. (For ease of reference, from this point on we will refer to fed cattle as simply "cattle," except where quoting.)

Once a meat packer purchases a pen of cattle, it has those cattle hauled to its factory and slaughters them. The packer then processes the carcasses into different cuts of meat (e.g., hamburger, New York strip, and filet mignon), packages the different cuts, and sells them to meat wholesalers, restaurants, and grocery stores.

The process we have described has been used to prepare cattle for the market since packers began buying pens of cattle directly from producers on the cash market about sixty years ago. (Before that, the buying and selling of cattle was

4

done through agents at stockyards in major cities in the Midwest with Chicago being the largest.)  During all but the last decade or so, packers purchased cattle almost exclusively through the cash market.

This is how the cash market works.  Buyers from the meat-packing companies spread out around the country to the different feed yards and inspect the pens of cattle that are ready to be sold.  If the buyer likes the cattle in a pen, he makes an offer to the producer or feed yard operator.  The producer or operator is free to accept or reject the packer's offer; in deciding whether to do so, he often considers offers being made for other pens of cattle around the country. (Much of this information is relayed over the telephone from one producer or operator to another.)  Often, the producer or feed yard operator and the buyer from the packing plant haggle over the price.  If they eventually agree on a price, the cattle in the pen are delivered to the packing plant seven days from the date of the agreement on price.  The price the packer paid for the pen of cattle is reported to a central office and average prices are published each week.

In the mid-1980s a number of cattle producers began looking for a new method of marketing their cattle to packers, one that did not require as much time and hassle as negotiating every pen of cattle on the cash market.  They came up with marketing agreements and eventually persuaded the packers, including Tyson, to begin using those agreements for some of their purchases.  The use of marketing

5

agreements spread slowly throughout the industry at first but began to pick up steam in the 1990s. By 1994 Tyson, among others, was using marketing agreements to procure a substantial part of the cattle it needed.[1]

Under the typical marketing agreement, a feed yard operator will call and tell the meat packer's buyer that he has a pen of cattle at its peak and ready to be sold. The feed yard operator promises to have the cattle delivered to the factory for slaughter within two weeks, with the packer getting to pick the exact date of delivery within that two-week period. The price paid for the cattle under the marketing agreement is pegged at the publicly released average cash-market price for the week prior to when the agreement is made. The agreement commonly provides that after the cattle are processed the price will be adjusted up or down based on the quality or the yield of the carcasses. The adjustment is quickly and easily calculated by Tyson as matter of course in processing the cattle.

To summarize, the difference is that with marketing agreements, unlike cash market purchases, the price is set not through bidding but automatically at the cash-market price the week before the agreement is made, the price is usually adjusted based on post-slaughter quality or yield, and the packer picks the actual delivery date within the two-week period that begins when the agreement is made.

---

[1] The record reflects that from 1994 to 2002 Tyson had purchased anywhere from twenty to fifty percent of its cattle supply through marketing agreements.

## II.

Pickett, and the class members he represents, sell their cattle exclusively on the cash market.[2] They claim that through marketing agreements Tyson has been able to manipulate the price of cattle on the cash market.[3] Tyson is the largest meat packer in the country. It processes forty percent of all hamburgers and steaks on American dinner tables. Tyson slaughters 10 million cattle each year, nearly one-half of the 25 million cattle that are purchased and slaughtered by meat-packing plants in this country.

---

[2] The class Pickett represents was initially certified as all cattle producers who sold cattle on the cash market to Tyson, including those who also sold cattle to Tyson through marketing agreements. We reversed this initial class certification after deciding that Pickett, who sold cattle to Tyson exclusively on the cash market and was challenging the legality of the marketing agreements, could not adequately and fairly represent the interests of producers who had sold cattle to Tyson through both the cash market and marketing agreements. Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280–81 (11th Cir. 2000). On remand, the class definition was restricted to cattle producers who sold cattle to Tyson exclusively on the cash market. We denied Tyson permission to appeal this second class certification. Iowa Beef Processors, Inc. v. Pickett, No. 02-90002 (11th Cir. Mar 5, 2002). It is this narrower class that Pickett represents.

[3] In his complaint, Pickett claims that Tyson violated the Packers and Stockyards Act through the use of captive supply arrangements. "Captive supply" is Pickett's pejorative term for Tyson's procurement of cattle through either of two methods for purchasing cattle outside the cash market: marketing agreements and forward contracts. The parties agree that Tyson buys only about three percent of its cattle through forward contracts, which is too little to have any effect on the cash market price. For that reason, the briefs essentially ignore forward contracts, and we will too. Marketing agreements account for a significant amount of Tyson's cattle purchases, enough to affect price, and for that reason they are the focus of the briefs and this opinion. We will not be referring to marketing agreements as "captive supply" arrangements because, as the district court pointed out, the term is a misnomer. Under marketing agreements, a producer's cattle is captive for no more than two weeks. Pickett v. Tyson Fresh Meats, Inc., 315 F. Supp. 2d 1172, 1175 n.1 (M.D. Ala. 2004). Moreover, "captive" means nothing more in this context than that Tyson has a contractual right to delivery of the cattle in exchange for which it must pay the purchase price. It would be as descriptive to refer to these cattle as "contractual supply."

Pickett's theory is that Tyson has used marketing agreements and its large market share to artificially reduce prices on the cash market. Prices for cattle on the cash market are responsive to supply and demand. Pickett claims that by using marketing agreements Tyson has withdrawn a large amount of demand from the cash market, thereby substantially decreasing price pressure there. The result, in Pickett's view, is that producers selling on the cash market have gotten a lower price for their cattle. A reduced cash-market price benefits Tyson in two ways. First, Tyson is able to obtain the cattle that it still purchases on the cash market (millions of head each year) at a lower price. Second, because the price Tyson pays for marketing agreement cattle is pegged to the average cash-market price, it pays less for those cattle too.

According to Pickett, the lower prices that Tyson pays for cattle are not an unintended consequence of its heavy use of marketing agreements to purchase much of its needs. To the contrary, Pickett alleges that those lower prices are the primary, intended consequence of marketing agreements. He claims that achieving lower prices in that manner constitutes an unfair practice and the manipulation of prices in violation of the Packers and Stockyards Act.

The case was tried for four weeks. Before the case was submitted to the jury, Tyson moved the district court for judgment as a matter of law under Fed. R. Civ. P. 50(a). The motion asserted, among other grounds, that Tyson had proven a

8

number of competitive justifications for using marketing agreements, the factual existence of which were not disputed by any evidence. The district court almost granted Tyson's Rule 50(a) motion, observing that Pickett had presented "a very thin case," but it decided to reserve ruling on the motion to see what the jury would do. The district court explained that granting the motion before the jury verdict risked having to re-do the whole trial if the appellate court disagreed, and a retrial would be long and costly.

The jury's "verdict" consisted of answers to a number of interrogatories. Specifically, the jury was asked—"yes" or "no"—whether it found, by a preponderance of the evidence:

1. That there is a nationwide market for fed cattle?
2. That the defendant's use of [marketing agreements] had an anti-competitive effect on the cash market for fed cattle?
3. That the defendant lacked a legitimate business reason or competitive justification for using [marketing agreements]?
4. That the defendant's use of [marketing agreements] proximately caused the cash market price to be lower than it otherwise would have been?
5. That the defendant's use of [marketing agreements] injured each and every member of the plaintiffs' class?[4]

The jury answered "yes" to each of those five questions.

The verdict form instructed the jury that, if it did answer "yes" to all of those questions, it should answer these additional questions:

---

[4] We have substituted "marketing agreement" for the term "captive supply" in the verdict form. See ante, at 7 n.3.

9

6. What amount, if any, do you find that defendant's use of [marketing agreements] damaged the cash market price of fed cattle sold to [the defendant] during the period from February 1, 1994, through October 31, 2002?

7. Did the defendant's use of [marketing agreements] depress the cash market price for fed cattle purchased by [the defendant] by an equal percentage for each year of the class period? If your answer is yes, by what percent?

The jury wrote "$1,281,690,000.00" in the question number 6 blank.[5] It answered question number 7 "no."

Following the verdict the district court granted Tyson's Rule 50(b) renewed motion for judgment as a matter of law, ruling "that [Pickett's] evidence is insufficient to support a finding that [Tyson] lacked a legitimate business justification for its use of [marketing agreements]." Pickett v. Tyson Fresh Meats, Inc., 315 F. Supp. 2d 1172, 1175 (M.D. Ala. 2004). It entered final judgment for Tyson. This is Pickett's appeal from that judgment.[6]

---

[5] Before submitting the questions to the jury, the district court had made clear to the parties that even if it entered a judgment for Pickett and the class, it had no intention of using as the amount of damages the jury's answer to question number 6: "I'm not—and no matter what verdict this jury comes back with, I'm not going to enter a judgment on that number if they bring one in because what we're talking about here includes people who are not members of the class." The court's point was that the amount of reduction in the cash market price of cattle was too broad a measure of damages, because it included those who sold some cattle outside the cash market, and those producers were not in the class.

[6] Before we get into the merits of the issues raised in this appeal, there is a procedural issue arising from the jury verdict form that we need to address. The form is unusual because it did not ask the jury to return a general verdict and the jury did not return one, even though it answered all of the interrogatories in favor of Pickett. A question arose at oral argument about whether an order granting Rule 50(b) relief properly may be entered where there has been no general verdict for either party. Cf. Fed. R. Civ. P. 49(a); Mason v. Ford Motor Co., 307 F.3d 1271, 1274 (11th Cir. 2002) ("When Rule 49(a) is employed, the jury makes specific factual

## III.

We review de novo a district court's grant of judgment as a matter of law, applying the same standard as the district court. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004). A district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action. Id. The court should deny it if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case. Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1313 (11th Cir. 1998); Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 659 (11th Cir. 1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.").

## A.

findings; and the judge makes the ultimate legal conclusions based on those facts.").

The answer is found in Rule 50(b)(2)(B), which provides that "if no verdict was returned" by the jury, the district court is authorized to "direct entry of judgment as a matter of law" on a renewed motion for it. Fed. R. Civ. P. 50(b)(2)(B). This result makes sense. If the evidence that the plaintiff presented at trial is insufficient for the jury reasonably to return a verdict for the plaintiff, the defendant is entitled to judgment regardless of whether the jury did return a verdict. The absence of a verdict in these circumstances is not materially different from the situation where the district court grants a defendant's motion for judgment as a matter of law before the case is submitted to the jury, which is authorized under Rule 50(a).

11

Pickett and his fellow class members contend that Tyson's marketing agreements violated the Packers and Stockyards Act. The relevant sections of the PSA make it:

> unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or . . .
> (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce . . . .

Packers and Stockyards Act § 202(a), (e), 7 U.S.C. § 192(a), (e).

It is undisputed that Tyson is a meat packer and that the PSA applies to its business. The dispute is over what is an "unfair" practice and what constitutes "any act for the purpose or with the effect of manipulating or controlling prices." Pickett contends he has established unfairness and price control or manipulation under the PSA by proving that Tyson's marketing agreements caused the cash-market price, and the overall market price, for cattle to be lower than it otherwise would be. If that were all Pickett were required to prove he might win, because there was evidence at trial to support the jury's finding that the use of marketing agreements has resulted in lower prices for cattle both on the cash market and the

market as a whole.[7]

Tyson, of course, urges a contrary reading of the PSA. It takes the position that because the PSA was meant as a protection against anti-competitive practices by meat packers, Pickett must establish more than that the use of marketing agreements have decreased the price for cattle. He must establish that their use has adversely affected competition, which requires showing that marketing agreements have no pro-competitive justifications.

The district court resolved this issue in Tyson's favor. After it did so, this Court resolved the meaning of "unfair" practice in PSA § 202(a) in the same way. In <u>London v. Fieldale Farms Corp.</u>, 410 F.3d 1295 (11th Cir. 2005), we held that "in order to succeed on a claim under the PSA, a plaintiff must show that the defendant's unfair, discriminatory or deceptive practice adversely affects or is likely to adversely affect competition." <u>Id.</u> at 1303. This, we explained, is consistent with the purpose and intent behind the PSA. "At the time of enactment, the chief evil Congress feared was the monopoly of the packers." <u>Id.</u> at 1302

---

[7] We say that Pickett "might win" because the critical evidence that the use of marketing agreements caused lower prices in the markets was the testimony of Professor Taylor, an expert witness for Pickett, and there are <u>Daubert</u> issues involving his testimony. <u>See Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993). The existence and seriousness of those issues are partly reflected in the district court judge's comment that if he were the factfinder, "I'd say, Dr. Taylor, you're nuts." Given the basis of our decision to affirm the district court's judgment on grounds independent of any <u>Daubert</u> issues, we can assume for present purposes that Tyson's use of marketing agreements did lead to lower prices in the cattle markets.

13

(citing Stafford v. Wallace, 258 U.S. 495, 514–15, 42 S. Ct. 397, 401 (1922)). "The primary purpose of the PSA was 'to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry.'" Id. (quoting H.R. Rep. No. 85-1048, at 1 (1958)). It was aimed at halting practices whose purpose was to destroy competition. Id. The London decision settles in this circuit that by "unfair" practice, PSA § 202(a) means a practice that does or is likely to adversely affect competition. Id. at 1303; see also Adkins  v. Cagle Foods JV, LLC, 411 F.3d 1320, 1324 n.6 (11th Cir. 2005).

In the London case there was no PSA § 202(e) price manipulation or control claim, as there is in this case, but the principles and purposes behind these two closely related provisions of the Act are the same. Section 202(e) is aimed at preventing a particular type of unfairness in the meat-packing industry, namely, price manipulation and control and the creation of monopolies. With section 202(e), as with section 202(a), "the chief evil Congress feared was the monopoly of the packers," and the primary purpose "was to assure fair competition and fair trade practices." London, 410 F.3d at 1302. For the same reasons a section 202(a) unfairness claim requires a plaintiff to show an adverse effect on competition, so does a section 202(e) price manipulation or control claim.

It was not Congress' intent in enacting the PSA to interfere with a meat packer's business practices where those practices did not interfere with

14

competition.  See IBP, Inc. v. Glickman, 187 F.3d 974, 978 (8th Cir. 1999) ("[W]e are . . . mindful that the purpose behind the Act was not to so upset the traditional principles of freedom of contract, as to require an entirely level playing field for all." (quotation omitted)).  If a packer's course of business promotes efficiency and aids competition in the cattle market, the challenged practice cannot, by definition, adversely affect competition.  See London, 410 F.3d at 1304 ("We note that elimination of a competitive impact requirement would subvert the policy justifications for the PSA's adoption."); see also Jackson v. Swift Eckrich, Inc., 53 F.3d 1452, 1458 (8th Cir. 1995) ("We are convinced that the purpose behind § 202 of the PSA, 7 U.S.C. § 192, was not to so upset the traditional principles of freedom of contract.  The PSA was designed to promote efficiency, not frustrate it."); Glickman, 187 F.3d at 978 (same); Griffin v. Smithfield Foods, Inc., 183 F. Supp. 2d 824, 828 (E.D. Va. 2002) (same).

In this case, the jury found that Tyson's use of marketing agreements "had an anti-competitive effect on the cash market for fed cattle" and that Tyson "lacked a legitimate business reason or competitive justification for using" marketing agreements.  The district court, in granting Tyson's Rule 50(b) motion for judgment as a matter of law, concluded that Pickett had failed to present any evidence to call into question Tyson's evidence establishing that marketing agreements:  (1) allow the company to keep up with competitors in the meat-

15

packing industry who also were reaping the cost benefits of marketing agreements; (2) provide the company with a reliable and consistent supply of cattle to keep its factories at full capacity; (3) reduce the transaction costs of having to negotiate individually for 200,000 pens of cattle a year to meet its needs; and (4) permit the company to match its cattle purchases with the needs of its customers. See Pickett, 315 F. Supp. 2d at 1175–77. In the district court's view, "the trial record is barren of any evidence which would permit the jury to conclude that [Tyson] lacked a legitimate business justification for its use of [marketing agreements]." Id. at 1176.

Pickett contends that the district court got it wrong. He argues that there was evidence to support a finding that all of Tyson's competitive justifications for using marketing agreements were pretextual, thus rendering reasonable the jury's finding that Tyson had no competitive justification for doing so. The pretext issue applied to the justifications Tyson asserted is what this case turns on. If there is evidence from which a jury reasonably could find that none of Tyson's asserted justifications are real, that each one is pretextual, Pickett wins. Otherwise, Tyson wins.

**B.**

We mentioned earlier in this opinion that marketing agreements were originated by cattle producers, not meat packers. Some cattle producers insist on

16

selling their cattle through those agreements and will not use the cash market. Others prefer to use marketing agreements for some or all of their cattle. Tyson's first competitive justification for using the marketing agreements is that it must use them in order to have access to the cattle of those producers. Otherwise, it will lose all of that supply, which constitutes a significant share of the market, to its competitors who do use the agreements. As the district court found, restricting its own use of marketing agreements "would pose problems for [Tyson], as it would have fewer cattle to choose from, and the quality and reliability of its cattle supply would likely suffer." Id. at 1176. In other words, Tyson needs to use marketing agreements to meet the competition.

Tyson presented a number of witnesses who testified to the factual premise of this justification: Tyson's competitors use marketing agreements and Tyson would suffer a serious competitive disadvantage if it did not use them. Some of Pickett's own witnesses testified to the same thing. No one disputed this justification as a factual matter. Instead, Pickett's position is that this justification is legally insufficient. He insists that a practice of purchasers that is unfair to sellers should not be allowed on the ground that all purchasers do it. In other words, there ought not be a "meet the competition" defense to conduct that the PSA otherwise prohibits.

The law does recognize a meet the competition defense in another context.

17

The Robinson-Patman Act, which amended the Clayton Antitrust Act, generally proscribes price discrimination between different purchasers of commodities of like grade and quality. Robinson-Patman Act § 2(a), 15 U.S.C. § 13(a). That is, a commodities dealer cannot charge its favored purchasers a lower price while selling at a higher price to others. The Robinson-Patman Act, however, recognizes an exception and provides for an absolute defense if a merchant's lower price to a purchaser "was made in good faith to meet an equally low price of a competitor." Id. § 13(b). That defense has been roundly criticized. See Hoover Color Corp. v. Bayer Corp., 199 F.3d 160, 163 (4th Cir. 1999) (collecting critiques of the Robinson-Patman Act by Justice Frankfurter and Judges Bork and Posner).

In any event, the PSA is not the Robinson-Patman Act. Unlike the latter, the PSA does not expressly provide a meet the competition defense. Congress could have written that defense into the PSA just as it did in the Robinson-Patman Act. We would be most reluctant to do Congress' writing for it, especially when the wisdom of the provision we are asked to write into the statute is debatable. But we need not go so far as to reject the meet the competition defense in PSA cases, because in this case that defense would not matter. It would not matter because Tyson has offered other justifications for its use of marketing agreements, and those justifications are legally permissible and factually uncontradicted in the record.

18

## C.

Tyson's second proffered competitive justification for marketing agreements is that their use provides the company with a reliable and stable supply of cattle for its packing plants. This is an unquestionably legitimate justification. See Glickman, 187 F.3d at 978 ("The record demonstrates that the [business practice] is an effort by IBP to have a more reliable and efficient method of obtaining a supply of cattle. The [PSA] was designed to promote efficiency, not frustrate it." (quotation omitted)).

Tyson contends that, because there are not enough cattle in the market to meet the demands of the entire packing industry from week to week, and because it must purchase 200,000 head of cattle each week to keep its processing plants running at full productive capacity, the company has to struggle to keep a constant supply of cattle coming into its plants. Before 1994 Tyson had to negotiate individually for each pen of cattle it purchased. Its competitors were also negotiating on the same pens of cattle, and the producers were free to accept or reject Tyson's offered price for a pen. If Tyson's offers were rejected for enough pens, the company could not fill its factory for the next week and it would not have enough product to meet its customers' demands.

Marketing agreements make the inventory crunch much less crunchy for Tyson. They are negotiated two weeks in advance of delivery of the cattle, and

19

Tyson picks the exact date of delivery within that two-week period. These features provide Tyson with greater ability to plan its purchases and to keep a steady flow of cattle coming into its plants. By contrast, the cash market provides Tyson with no leeway about the delivery date, because cattle purchased on it are always delivered seven days after purchase. On the cash market there is a greater risk that Tyson's buyers will purchase too little cattle for its needs, or too much for its plants to process within the constrictions of the delivery dates. The economic effect of these differences between the two procurement methods is critically important for a large meat packer whose profit depends on keeping its plants operating at full capacity without interruptions.

The underlying facts relating to this justification were not disputed at trial. Both Tyson's and Pickett's witnesses testified to them. James Herring, president of Friona Industries, a collection of feed yards in the Texas panhandle, testified that buying cattle through marketing agreements guarantees for Tyson a certain number of cattle per week. Lee Borck, the president and principal negotiator for the Beef Marketing Group, a consortium of thirteen feed yards in the Midwest, testified that marketing agreements ensure that Tyson will "have a percentage of their cattle that are going to be procured for a plant that's difficult to procure cattle for." Jerry Hausman, an economics professor from the Massachusetts Institute of Technology, testified that "what marketing agreements do is it helps [Tyson] to

20

better schedule its plants. And by cutting down the variability, they're going to get greater capacity utilization and higher profits." And Bruce Bass, Tyson's head buyer, stated that marketing agreements ensure a consistent supply of cattle for the company's processing plants.

Professor Catherine Durham, one of Pickett's expert economists, agreed with this assessment when she was asked about the use of marketing agreements on cross-examination:

> Q. You would agree with me, Professor Durham, that marketing agreements also help [Tyson] guarantee a minimum supply of cattle at the plants that get marketing agreement cattle, right?
> A. Yes.
> Q. And [Tyson] has a valid business interest in having a steady supply of cattle at its packing plants, right?
> A. Yes.

The economics of this are simple. As Professor Hausman explained, being able to keep its processing plants operating at capacity has increased Tyson's efficiency. Keeping the doors to its plants open and the machinery running is a fixed cost for Tyson. No matter how many cattle the plant processes on a given day, Tyson has fixed costs for the facility and equipment, the electricity used to run the plant, and the salaries of a minimum number of employees needed to run the plant. Whether the plant slaughters 2,000 head or 20,000 head of cattle on a given day, the fixed cost will be the same.

If Tyson slaughters 20,000 head of cattle, the fixed costs of operating the

plant are divided by a factor that is ten times larger than when it slaughters only 2,000 head. The more cattle Tyson processes on a given day, the less the fixed cost per head. By ensuring that the processing plants are consistently filled and operate at or near capacity, the use of marketing agreements provides Tyson with a more cost-effective operation. This result, which is entirely in harmony with the goals of the PSA, see Jackson, 53 F.3d at 1458 ("The PSA was designed to promote efficiency, not frustrate it."), is a legitimate, pro-competitive justification.

Pickett offered no evidence to dispute the existence of this justification. Instead, through examination of Tyson's witnesses, Pickett simply brought out the unremarkable fact that if Tyson were willing to pay "a high enough price" or "throw our billfold out the window" it could get from the cash market as many cattle as it wanted for its processing plants (and even then it would be difficult). Of course, in hypotheticals where economic constraints are assumed away, economic problems are not problems. But this is not a hypothetical case. Tyson is an actual business that operates in the real world through real markets where there are real economic limits. Tyson has competitors who stand ready, willing, and able to undercut the price of its product if it pays too much for the raw materials used to produce that product.

**D.**

Tyson's third proffered competitive justification for purchasing some of its

22

cattle through marketing agreements is that doing so reduces its transaction costs by eliminating the need to negotiate for each individual pen of cattle, as it must on the cash market. With the cash market, buyers for Tyson are constantly on the road inspecting pens of cattle in a never-ending effort to see if the cattle in each pen match the quality the company needs to fill its customers' orders. Once the buyer finds a pen that appears to fit the needs, he places a bid with the producer. The producer usually is conducting simultaneous negotiations with one or more of Tyson's competitors for the same pen. After days of going back and forth, the producer chooses the highest bid, which may or may not be Tyson's. This process is costly for both the producers and Tyson because it takes so much time. Tyson has to successfully outbid other packers for more than 1,000 pens every week (the pens each consisting of between fifty and 200 cattle) in order to meet its need for 200,000 head per week.

As a number of Tyson's witnesses testified, marketing agreements eliminate the time and energy spent by packers and producers negotiating for individual pens. Under the agreements the price of the cattle is set at the average cash-market price (plus a yield adjustment that is determined after processing). Mr. Borck, the principal negotiator for BMG feed yards, testified that when using the cash market he was spending three or four days a week on the phone with meat packers negotiating the price for his peak cattle. This was "not very productive time."

23

With the marketing agreement system, Mr. Borck estimated that it now takes "half a day a week" to sell the peak cattle to the packer. He spends the rest of this "high-priced management time to try and be more efficient in our operations and in the caretaking of the cattle."

Other cattle producers and feed yard operators agreed with Mr. Borck. Jim Keller, a feed yard operator in Kansas, testified that he preferred marketing agreements because he "didn't have to waste time talking about prices. Some people like that. They like haggling over price. I don't. I don't. I always think I could probably be doing something different." Professor Hausman testified that because the price in marketing agreements is set, "marketing agreements are going to decrease transactions costs and therefore decrease the costs for [Tyson] and also likewise for the feedlot operator as well." This was a valid business justification, he continued, "because it's economically efficient to decrease your transactions costs. Anything that decreases costs like that increases economic efficiency, both for [Tyson], for the feedlot operator, and also for the U.S. economy." Mr. Bass, Tyson's head buyer, confirmed this. He said that from 1994 to 2002, Tyson has been able to decrease the number of buyers it employs by about fifteen percent, partly because of the increasing popularity of marketing agreements among cattle producers and feed yards.

Pickett did not dispute any of this. In fact, many of his witnesses agreed

24

with Tyson's witnesses that marketing agreements relieve producers and packers from the burden of spending their time on negotiating prices, instead of on raising and processing cattle. Brett Gottsch, a cattle producer from Nebraska who testified for Pickett, conceded that with marketing agreements buyers and feed yard operators do not need to "go through the process of bidding and negotiating prices." Robert Rothwell, a cattle producer and feed yard operator in Nebraska, testified that purchasing cattle through marketing agreements requires less time and energy than purchasing cattle through the cash-market system. And Jeff Biegert, another producer from the Midwest, joked that with marketing agreements, the buyers for packing companies "could be playing golf if [they] wanted to, and the cattle will still get marketed."

In sum, it was undisputed at the trial that marketing agreements are a more efficient means for both meat packers and cattle producers to operate in the market. It was undisputed that use of the agreements has lowered the transaction costs of producers and meat packers, including Tyson. Witnesses for both parties recognized that these are pro-competitive benefits for the industry. Those benefits are entirely consistent with the goals of the PSA. See Glickman, 187 F.3d at 978.

**E.**

Tyson's final competitive justification for using marketing agreements is that they allow the company to pay for each head of cattle in a pen individually

based on the quality of the meat, rather than paying for the entire pen "on the average." Among other benefits, this gives producers an incentive to provide packers with the quality and yield of meat they need to satisfy their customers' demands.

In the cash-market system, buyers for the packing companies pay a single price for an entire pen of cattle which results in an average price per head in the pen. With this "on the average" system, producers can put some of their less desirable cattle—those with less quality meat or lower usable meat yields—in the same pen as high-quality, high-yield cattle. The packer who buys that pen gets some cattle that match its customers' needs and some that do not. The other side of the problem is that producers with a large share of high-quality or high-yield cattle do not always get rewarded for it. This disparity between the quality and yield of the cattle and the price paid for them on the cash market, which is a disparity that can go either way, is the result of buyers not being able to closely inspect and assess the quality and yield of fifty to 200 head of cattle in each of the many pens that they must haggle over in the cash market.

With marketing agreements, meat packers also buy an entire pen of cattle but with an important difference: the price paid for the cattle is adjusted up or down after slaughter to reflect the actual quality and yield of the meat. The final price depends not on the buyer's in-the-field estimate of the meat that a pen of

26

cattle will produce, but on the actual meat that does result after slaughter. This feature of marketing agreements takes away the incentive for producers to mix low-quality and low-yield cattle in with better ones, and it gives them an incentive to increase the overall quality and yield of their cattle. Both results are good for the industry and for competition.

The factual premise for this justification was not disputed at trial. A number of witnesses, both for Tyson and for Pickett, testified to it. Mr. Gottsch, who testified for Pickett, stated that one advantage of marketing agreements is that the packer pays the producer for each cow in the pen based on the quality. Mr. Rothwell, another of Pickett's witnesses, agreed that individual pricing was a "valid business justification" for buying and selling cattle through marketing agreements. And, Mr. Biegert, one of the Nebraska producers testifying for Pickett, conceded that "paying a feedyard a premium for really high quality cattle will create economic incentives that go all the way back to the [producer] and can cause the [producer] to strengthen his cowherd."

Professor Hausman, Tyson's expert, agreed with the three producers who testified for Pickett. He said that by paying for each head of cattle, rather than paying for the pen on the average, the packer creates an economic incentive for the producers to grow better cattle. He went on to explain that "if you get paid the average, you don't have an economic incentive nearly as much; because if you

27

have some bad cattle and some good cattle, they sort of average out." Mr. Keller, the feed yard manager from Kansas, concurred with the professor. He testified that one thing that "really bothered" him about the cash market was that "all the cattle were getting sold for the very same price. All cattle, no matter what they were, what quality, everything getting sold on the same price."

Because price is adjusted to fit actual quality and yield, marketing agreements provide Tyson with another, related competitive benefit. Like most other companies in our complex economy, Tyson has a specific niche market for its products—in its case, steaks and hamburgers. It is a volume meat dealer; its largest customers are supermarket chains. To provide for its customers in the most inexpensive and efficient way, Tyson prefers large, high-yielding cattle to leaner, high-quality cattle. High-yield cattle tend to have middle-grade meat, and that is fine with Tyson. By focusing its procurement on high-yield instead of high-quality cattle, Tyson is better able to meet the needs of its customers at lower costs.

Through marketing agreements, Tyson provides an incentive for producers to raise and sell more high-yield cattle. On the cash market, the best Tyson can do is have its buyers attempt to purchase pens that appear to have the highest number of high-yield cattle. But that is an inexact science. With marketing agreements, the post-slaughter price more closely matches the actual yield, which provides an incentive for producers to supply Tyson with the high-yield cattle it needs. See

Griffin, 183 F. Supp. 2d at 828–29 (rejecting pork producers' PSA claim in part because "[t]he Defendants decided that the guess work required to fulfill their needs at cash markets was inefficient for themselves and the consumer").

The factual existence of this pro-competitive benefit was not disputed at trial. Counsel for Tyson asked Professor Hausman: "[I]f a packer is buying cattle under a marketing agreement, can it do anything to try to influence the type of animals that the participating feedyards produce?" Professor Hausman responded:

> Yes. It has—it offers money. That's what it does. So it has this grid and it says, you know, if we want higher yield, we'll pay you more money for higher yield. If it pays more money, the feedyard operator is going to say, you know, more money is good for me and my cattle owners, so I'm going to try to increase yield.

And, the incentive works. Since 1994, when it began to significantly increase its use of marketing agreements, the cattle that Tyson has purchased from marketing agreements has had a higher yield than the cattle it has purchased on the cash market.

Instead of producing evidence to dispute the existence of this advantage of marketing agreements, Pickett argues that the benefit could be obtained through the cash market if it were changed. One of Pickett's two experts, Professor Durham, testified that the cash market, like marketing agreements, can also provide incentives for quality by making the same sort of offers and discounts and premiums. She did not, however, contradict the fact that, as Pickett's witnesses

29

described its current operation, the cash market does not provide incentives for quality and yield. We deal with real markets the way they are, not with how they might be redrawn on the blackboard in a classroom.

Pickett also argues that cattle sold on the cash market is of higher quality than cattle sold through marketing agreements. Professor Hausman, Tyson's expert, agreed that "those feedlots that sell cash-only cattle have a significantly higher percentage of prime and choice grades than the feedlots that sell marketing agreement cattle." That is, however, beside the point because Tyson is not looking for high-quality meat. As we have already explained, Tyson wants high-yield meat, which tends to be middle-quality. Tyson structures its marketing agreements to encourage producers to raise high-yielding cattle, not high-quality cattle. It uses marketing agreements to obtain the kind of meat that it needs to supply its customers at a competitive price. Tyson and its customers, not Pickett, get to decide what kind of meat it needs.

## F.

In sum, while Pickett presented evidence at trial that Tyson's marketing agreements have decreased the price of cattle on the cash market and on the market as a whole, he did not present any evidence from which a reasonable jury could conclude that Tyson lacked pro-competitive justifications for using the agreements. The evidence is undisputed that marketing agreements provide a more reliable and

stable supply of cattle for meat packers, reduce their transaction costs for purchasing cattle, and allow them to better match price to actual quality and yield. A jury could not reasonably find, as the one in this case did, that Tyson had no competitive justification for using marketing agreements.

The jury may have been swayed by more than the evidence relating to competition and markets. In his opening statement, Pickett's counsel sounded this theme:

> I want to pause to mention to you that we're talking here about a part of America's economy that is perhaps in some ways the most romanticized part. We celebrate the cattle business in our books and in our music and in our literature and in our movies, and have for years. And over the years, the one thing that the cattle business has stood for during the growth and the development of our country has been independence, fierce independence, meaningful and forceful independence.

While talk about the independence of cattle farmers has emotional appeal, the PSA was not enacted to protect the independence of producers from market forces. It was enacted to prevent unfair practices, price fixing and manipulation, and monopolization. See London, 410 F.3d at 1301 ("At the time Congress enacted the PSA, the chief evil feared was the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." (quotations and alternations omitted)). The PSA was enacted to ensure that the market worked, and markets are notoriously unromantic.

31

The district court in <u>Griffin v. Smithfield Food, Inc.</u> was faced with a similar argument by pork producers against the procurement methods of pork packers. In that case, Smithfield, the largest pork packer, had switched from buying its hogs on the cash market to buying them through marketing agreements or obtaining them from farms that Smithfield itself owned. The producers who did not want to sell their hogs through marketing agreements sued under the PSA, contending, as Pickett contends here, that the packer's conduct was unfair and had the effect of manipulating or controlling prices. <u>Griffin</u>, 183 F. Supp. 2d at 825.

In rejecting the pork producers' claim, the court in that case explained that the lawsuit was premised not on Smithfield's unwillingness to do business with the producers. <u>Id.</u> at 828. Instead, the core of the producers' complaint was that Smithfield had "timing and quality control standards that the [producers] find an affront to their independence." <u>Id.</u> This, the court explained, was not enough to prohibit a more efficient, consistent, and consumer-friendly purchasing method:

> While such independence may be a virtue in many respects, the family farm, the corner grocer and the main street specialty store have all fallen victim to the direction in which the country's economy has developed. No degree of sympathy for the [producers'] difficulty in maintaining their traditional way of doing business translates to wrongdoing on the part of the [packer].
> . . . .
> The [producers'] evidence demonstrates that economic developments in their industry have overtaken them; their evidence does not demonstrate that their economic woes were caused by any actionable wrongdoing of Smithfield under the PSA or any other theory.

32

Id. at 828, 830.

Exactly the same is true here. Pickett and his fellow class members could have entered into marketing agreements with Tyson. Many of the producers who testified on Pickett's behalf had themselves sold cattle through them. With marketing agreements, producers do lose some of their independence because meat packers get to dictate the date of delivery and adjust the price to the actual yield of the cattle. Some producers find the advantages of marketing agreements worth any loss of independence; it was, after all, producers who came up with the idea of marketing agreements. Other producers, like Pickett, place a higher premium on independence and prefer the cash market. They are entitled to their preferences, but they are not entitled to force those preferences on other producers and on the packers. See Glickman, 187 F.3d at 977 ("[W]e are . . . mindful that the purpose behind the Act 'was not to so upset the traditional principles of freedom of contract . . . .'" (quoting Jackson, 53 F.3d at 1458)).

AFFIRMED.