[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10338
Non-Argument Calendar

_____

D.C. Docket No. 4:15-cv-00325-RH-CAS

STANLEY SNEAD,

Plaintiff-Appellee,

versus

FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY BOARD OF
TRUSTEES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(February 21, 2018)

Before ROSENBAUM, JORDAN, and WILSON, Circuit Judges.

PER CURIAM:

Appellee Stanley Snead was a campus police officer at the Florida
Agricultural and Mechanical University from May of 2005 until December of
2013. In August of 2013, under the supervision of a new police chief, the

department changed its officers' work schedules.   Whereas under the prior supervision, officers were scheduled to work eight-hour shifts, under the new chief, officers were scheduled to work for twelve hours at a time (though one shift every pay period remained eight hours long).   Snead tried working these new shifts for a while but soon found himself experiencing symptoms related to high blood pressure.   After his doctor identified the twelve-hour shifts as the culprit, Snead requested to work shorter shifts.   The department refused, and Snead retired. Snead then sued the university's Board of Trustees, the appellant in this case ("FAMU"), under the Americans with Disabilities Act ("ADA"), claiming that the university effectively forced him into retirement by refusing to provide him with a reasonable disability accommodation.

The district court held a jury trial lasting two days.   After Snead put on all his evidence, FAMU moved for judgment as a matter of law, arguing that Snead had failed to put on any evidence (1) that twelve-hour shifts were not an "essential function" of his job, and (2) that the accommodation he requested was reasonable. According to FAMU, Snead had "not provided any evidence whatsoever" to show that twelve-hour shifts were not a required part of the job, nor had he shown that

2

reverting to eight-hour workdays was a reasonable accommodation under FAMU's new scheduling regime.[1]

The district court took the motion under advisement and let the case go to the jury. The jury found FAMU liable for violating the ADA and awarded Snead $142,268.00 for "lost wages and benefits" and $108,810.00 for "mental and emotional anguish." The court then denied FAMU's outstanding motion for judgment as a matter of law. On appeal, we must decide whether that was correct.

## I.

We review de novo a district court's decision to deny judgment as a matter of law. *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005). A district court should grant judgment as a matter of law when the plaintiff "presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Id.* Otherwise, the motion should be denied. *Id.* We must construe the evidence in the light most favorable to the non-moving party. *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1215 (11th Cir. 2004).

Snead's claim arises under the ADA, which provides that employers shall not discriminate against a qualified employee based on that person's disability. 42

---

[1] Because of the trial court's break schedule, FAMU presented these arguments after both sides had finished putting on all their evidence. The judge told the parties that he would "treat the motion as renewed now at the close of all the evidence." Neither side objected.

U.S.C. § 12112(a). An employer violates the ADA if it fails "to make reasonable accommodation for an otherwise qualified disabled employee . . . ." *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005) (citing 42 U.S.C. § 12112(b)). To establish a failure to accommodate, the employee "must demonstrate that (1) he has a disability, (2) he is a 'qualified individual,' which is to say, able to perform the essential functions of the employment position that he holds or seeks with or without reasonable accommodation, and (3) the [employer] unlawfully discriminated against him because of the disability." *D'Angelo*, 422 F.3d at 1226 (internal quotation marks omitted).

The ADA defines a "qualified individual" as someone with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential functions" are the "fundamental job duties of a position that an individual with a disability is actually required to perform." *Id.* at 1257; *see also* 29 C.F.R. § 1630.2(n)(2)(i). Whether a job function is "essential" must be evaluated on a case-by-case basis. *Holly v. Clairston Indus.*, 492 F.3d 1247, 1256 (11th Cir. 2007). Factors to evaluate include the employer's judgment as to whether the function is essential, the amount of time the function requires, the consequences of not requiring the employee to do it, the terms of any collective bargaining agreements, the experience of those who previously held the job, and

the experience of those currently in similar jobs. *Id.* "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-56 (11th Cir. 2001).

Even if an employer failed to provide a reasonable accommodation, the employer may still avoid liability by showing "that the accommodation would impose an undue hardship on the operation of [its] business . . . ." 42 U.S.C. § 12112(b)(5)(A).

## II.

We conclude that a reasonable jury could have determined Snead was entitled to relief under the ADA. FAMU argues that Snead failed to prove (1) what the "essential functions" of his job were, (2) that he could perform them, and (3) that his requested accommodation was reasonable. FAMU also asserts that the district court erred by declining to find that Snead's requested accommodation would have caused FAMU undue hardship. The record, however, shows that Snead in fact provided evidence of all three items raised by FAMU. And the record further shows that FAMU did not meet its burden to make out the affirmative defense of undue hardship.

First, Snead provided evidence of the job's essential duties by entering into evidence FAMU's "Position Description" for the Law Enforcement Officer

5

position.  That document listed a number of "Essential Functions" to the job, which the document defined as "those tasks or functions that are fundamental to the position and affects [sic] position classification."  The Position Description sheet does not list any specified shift length among those job functions labeled as "essential."  Instead, a separate section of that form entitled "WORKING HOURS" states the following:  "80-hour biweekly pay period, consisting of six (6) 12-hour workdays and one 8-hour day," noting also that "[d]epending upon the needs of the departments, shifts may be changed."  In other words, FAMU's own form specified a number of "essential" job functions but did not include shift length among them.  And in the section in which it did address working hours, the form specified that those hours could change (without specifying whether they might be shortened or lengthened).  From all of this, the jury could have reasonably concluded that the essential functions of Snead's job were those functions—and only those functions—listed as "essential" on the job description.

FAMU argues on appeal that the section of the form listing "essential" job functions is not exhaustive.  It points out the form does specify that officers' working hours consist of twelve-hour shifts, a fact it says demonstrates that twelve-hour shifts are essential to the job.  This might be a reasonable interpretation of the Position Description form.  But the question we must decide is whether that is the *only* reasonable interpretation.  As discussed, it is not.  FAMU also points to the

testimony of various university officials in which those officials explained the importance of officers working twelve-hour shifts. This, too, might amount to some evidence that working those shifts was an essential job function. But our task is not to weigh evidence or make credibility judgments. A reasonable jury could have looked to the Position Description form and decided that the form's plain labeling outweighed any other evidence presented. Our inquiry must end there.

Second, Snead's testimony and a letter from his cardiologist provided ample evidence for a reasonable jury to conclude he could perform his job functions. Snead testified at trial that he was able to perform each and every job duty listed as either "essential" or "marginal" on his job description. And a letter from Snead's cardiologist, admitted into evidence as a trial exhibit, stated that after reviewing FAMU's job description for Snead's job, the cardiologist believed Snead was "capable of performing the listed job duties" but should "be restricted to working daytime hours and 8-hour shifts."

FAMU characterizes Snead's testimony as "self-serving" and "unsupported." But whether or not it is self-serving, his cardiologist's letter does away with any contention that his testimony was "unsupported." Snead put on enough evidence for a reasonable jury to conclude he could have performed all essential job functions even with his requested accommodation.

Third, Snead provided evidence both that his requested accommodation was to revert to his previous shift schedule and that such a request was reasonable. He entered into evidence a letter from his physician, Tracey Hellgren, specifying the accommodation she recommended on his behalf. Hellgren's letter served as evidence of what the accommodation itself would have entailed because in the letter, she requested "a medical accommodation to return Mr. Snead to his previous daytime eight hour shift duties and to be off permanently from his nighttime twelve hour shifts." Snead also entered into evidence a copy of his Position Description sent to FAMU by Hellgren containing Hellgren's markups. On this document, Hellgren wrote in the margins that Snead should work "7am-3pm M-F," that he should work a "40 hour work week," and that he is "unable to do 12 (twelve) hour shifts safely." Snead testified at trial that his "previous daytime 8-hour-shift duties" included finishing up work beyond his scheduled end time, working football games, and covering a variety of other unlisted duties. Based on all of this, a jury could have reasonably interpreted "his previous daytime eight hour shift duties" to mean the shifts he used to work before the department's switch. The jury could have concluded that this language Hellgren employed allowed for Snead to engage in all of his pre-switch duties, even the ones that included finishing up his work beyond his scheduled end time.

8

FAMU argues that Hellgren's instructions must be read literally and rigidly to have prohibited him from working anything beyond an eight-hour work day and a forty-hour work week.  True, Hellgren's instructions could reasonably be read as prescribing firm limits to Snead's work hours with no exceptions.  But, again, that is not our inquiry.  We must ask only whether the jury could have reasonably interpreted her instructions as allowing FAMU to return Snead to his previous work schedule, which included occasional shift extensions and special events outside of his regular hours.  Again the answer is yes.

Of course, even if Snead really was asking to work exactly the same kinds of hours he worked before, it is a separate question to ask whether that was a reasonable-accommodation request.  An accommodation is reasonable under the ADA "only if it enables the employee to perform the essential functions of the job."  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007).  Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C.A. § 12111 (9)(B).  As we have discussed, Snead provided enough evidence for a reasonable jury to conclude he could perform all essential job functions with his

9

requested accommodation.  For this reason, the jury also could have concluded his accommodation request was reasonable.

## III.

Finally, we must consider whether the jury could have reasonably concluded that FAMU could not have accommodated Snead without undue hardship.  "Undue hardship" means "significant difficulty or expense incurred by a covered entity, when considered in light of" several factors.  29 C.F.R. § 1630.2(1).  Those factors include "[t]he nature and net cost of the accommodation needed"; "[t]he overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources"; "[t]he overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities"; "[t]he type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity"; and "[t]he impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business."  29 C.F.R. § 1630.2(p)(2).  Because undue hardship is

an affirmative defense, the burden of proving it lies with the defendant. *Willis v. Conopco, Inc.*, 108 F.3d 282, 286 (11th Cir. 1997).

FAMU relies on the testimony of Terence Calloway, chief of the university's police force, who explained the effects he believed Snead's requested accommodation would have on the department. Calloway testified to several negative consequences: (1) Snead would miss the department's daily briefings at 6:00 a.m.; (2) letting Snead off promptly after eight hours would disrupt the handling of any ongoing situations and potentially endanger the officer replacing him; (3) Snead would have multiple supervisors per week, which would disturb the accuracy of his evaluations; (4) the department would have diminished manpower on weekends; (5) there would not be enough patrol cars on weekdays for everyone working; and (6) the department would have to pay someone overtime to work the remaining hours of the day after Snead's shift ended. FAMU contends that because Snead provided no evidence the contrary, the only reasonable conclusion a jury could have reached is that Snead's requested accommodation would have imposed an undue hardship on the department.

This argument falls short for two reasons. First, much of Calloway's hardship testimony assumed a rigid interpretation of Snead's requested accommodation. Had Snead in fact requested to work only between 7:00 a.m. and 3:00 p.m. five days per week with no exceptions, then perhaps no reasonable jury

11

could have declined to find undue hardship. But as we have noted, a reasonable jury could have found that Snead instead requested to revert back to his former schedule in which he stayed beyond the end of his shifts as needed and worked both football games and special events. Assuming as we must that the jury made this finding, it was free to ignore as irrelevant Calloway's testimony about any hardships that would have arisen from accommodating Snead through any other work schedule he was not actually asking for.

But second, even as to the rest of the purported hardships Calloway identified, a reasonable jury could have disregarded them wholesale in light of several bits of less plausible testimony Calloway gave. Calloway testified that as a result of changing officers' default shifts from eight hours to twelve, the department saved enough money to purchase new police vehicles, computers, guns, and uniforms, among other things, and started training its officers in-house instead of contracting training to an outside entity. On cross-examination, however, Calloway testified that the department would not have been able to afford any and all of those things if he had given Snead his requested accommodation. The jury was not required to believe the claim that reducing the shift length of a single line-level employee would have required such extreme results. Calloway did of course offer other testimony that was plausible on its own. For instance, he testified that the department would have incurred costs from paying overtime to

12

other employees.  But where a witness has offered some testimony that is inherently unbelievable, a jury is within its right to disregard the rest of that witness's testimony, too.  *See N.L.R.B. v. Pittsburgh S.S. Co.*, 337 U.S. 656, 659 (1949) ("[I]n the determination of litigated facts, the testimony of one who has been found unreliable as to one issue may properly be accorded little weight as to the next."); *Liberty Mut. Ins. Co. v. Thompson*, 171 F.2d 723, 726 (5th Cir. 1948) (jury "may reject all of [a witness's testimony] if the jury believes that such witness has willfully and corruptly sworn falsely to any material fact).  A reasonable jury could have heard Calloway's implausible testimony here and chosen to disregard the rest of what he said, too.  Since Calloway's testimony was the only evidence of hardship FAMU presented, the jury's verdict was reasonable.

For all these reasons, we find no error in the district court's decision to deny judgment as a matter of law.

**AFFIRMED.**

13